THOMAS *v.* REVIEW BOARD OF THE INDIANA
EMPLOYMENT SECURITY DIVISION ᴇᴛ ᴀʟ.

No. 79–952.  Argued October 7, 1980—Decided April 6, 1981

Burger, C. J., delivered the opinion of the Court, in which Brennan, Stewart, White, Marshall, Powell, and Stevens, JJ., joined, and in Parts I, II, and III of which Blackmun, J., joined. Blackmun, J.,

filed a statement concurring in part and concurring in the result, *post*, p. 720. REHNQUIST, J., filed a dissenting opinion, *post*, p. 720.

*Blanca Bianchi de la Torre* argued the cause for petitioner. With her on the briefs were *Seymour H. Moskowitz* and *Michael Martin Mulder.*

*William E. Daily* argued the cause for respondents. With him on the brief were *Theodore L. Sendak,* Attorney General of Indiana, and *Janis L. Summers* and *Cindy A. Ellis,* Deputy Attorneys General.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether the State's denial of unemployment compensation benefits to the petitioner, a Jehovah's Witness who terminated his job because his religious beliefs forbade participation in the production of armaments, constituted a violation of his First Amendment right to free exercise of religion. 444 U. S. 1070 (1980).

I

Thomas terminated his employment in the Blaw-Knox Foundry & Machinery Co. when he was transferred from the roll foundry to a department that produced turrets for military tanks. He claimed his religious beliefs prevented him from participating in the production of war materials. The respondent Review Board denied him unemployment compensation benefits by applying disqualifying provisions of the Indiana Employment Security Act.[1]

---

*Briefs of *amici curiae* urging reversal were filed by *Judith Levin* for the American Civil Liberties Union; by *Nathan Z. Dershowitz* for the American Jewish Congress; and by *Leo Pfeffer* for the Jewish Peace Fellowship et al.

*Lee Boothby* filed a brief for Americans United for Separation of Church and State Fund, Inc., as *amicus curiae.*

[1] Indiana Code § 22-4-15-1 (Supp. 1978) provides:

"With respect to benefit periods including extended benefit periods established subsequent to July 6, 1974, and before July 3, 1977, an individual

Thomas, a Jehovah's Witness, was hired initially to work in the roll foundry at Blaw-Knox. The function of that department was to fabricate sheet steel for a variety of industrial uses. On his application form, he listed his membership in the Jehovah's Witnesses, and noted that his hobbies were Bible study and Bible reading. However, he placed no conditions on his employment; and he did not describe his religious tenets in any detail on the form.

Approximately a year later, the roll foundry closed, and Blaw-Knox transferred Thomas to a department that fabricated turrets for military tanks. On his first day at this new job, Thomas realized that the work he was doing was weapons related. He checked the bulletin board where in-plant openings were listed, and discovered that all of the remaining departments at Blaw-Knox were engaged directly in the production of weapons. Since no transfer to another department would resolve his problem, he asked for a layoff. When that request was denied, he quit, asserting that he could not work on weapons without violating the principles of his religion. The record does not show that he was offered any non-weapons work by his employer, or that any such work was available.

Upon leaving Blaw-Knox, Thomas applied for unemployment compensation benefits under the Indiana Employment Security Act.[2] At an administrative hearing where he was

---

who has voluntarily left his employment without good cause in connection with the work or who was discharged from his employment for just cause shall be ineligible for waiting period or benefit rights for the week in which the disqualifying separation occurred and until he has subsequently earned remuneration in employment equal to or exceeding the weekly benefit amount of his claim in each of ten (10) weeks. The weeks of a disqualification period remaining at the expiration of an individual's benefit period will be carried forward to an extended benefit period or to the benefit period of a subsequent claim only if the first week of such extended benefit period or subsequent benefit period falls within ten (10) consecutive weeks from the beginning of the disqualification period imposed on the prior claim."

[2] Ind. Code § 22-4-1-1 *et seq.* (1976 and Supp. 1978).

not represented by counsel, he testified that he believed that contributing to the production of arms violated his religion. He said that when he realized that his work on the tank turret line involved producing weapons for war, he consulted another Blaw-Knox employee—a friend and fellow Jehovah's Witness. The friend advised him that working on weapons parts at Blaw-Know was not "unscriptural." Thomas was not able to "rest with" this view, however. He concluded that his friend's view was based upon a less strict reading of Witnesses' principles than his own.

When asked at the hearing to explain what kind of work his religious convictions would permit, Thomas said that he would have no difficulty doing the type of work that he had done at the roll foundry. He testified that he could, in good conscience, engage indirectly in the production of materials that might be used ultimately to fabricate arms—for example, as an employee of a raw material supplier or of a roll foundry.[3]

The hearing referee found that Thomas' religious beliefs specifically precluded him from producing or directly aiding in the manufacture of items used in warfare.[4] He also found that Thomas had terminated his employment because of these religious convictions. The referee reported:

"Claimant continually searched for a transfer to another department which would not be so armament related;

---

[3] It is reasonable to assume that some of the sheet steel processed in the roll foundry may have found its way into tanks or other weapons; the record, however, contains no evidence or finding on this point.

[4] The referee indicated, App. to Pet. for Cert. 2a:

"The evidence reveals that approximate [sic] two to three weeks prior to claimant's date of leaving, the 'Roll Foundry' was closed permanently and claimant was transferred to the terret [sic] line. [He], at this time, real [sic] realized that all of the other functions at The Blaw-Knox company were engaged in producing arms for the Armament Industry. Claimant's religious beliefs specifically exempts [sic] claimants from producing or aiding in the manufacture of items used in the advancement of war."

however, this did not materialize, and prior to the date of his leaving, claimant requested a layoff, which was denied; and on November 6, 1975, *claimant did quit due to his religious convictions.*" [5]

The referee concluded nonetheless that Thomas' termination was not based upon a "good cause [arising] in connection with [his] work," as required by the Indiana unemployment compensation statute. Accordingly, he was held not entitled to benefits. The Review Board adopted the referee's findings and conclusions, and affirmed the denial of benefits.[6]

The Indiana Court of Appeals, accepting the finding that Thomas terminated his employment "due to his religious convictions," reversed the decision of the Review Board, and held that § 22–4–15–1, as applied, improperly burdened Thomas' right to the free exercise of his religion. Accordingly, it ordered the Board to extend benefits to Thomas. 178 Ind. App. ——, 381 N. E. 2d 888 (1978).

The Supreme Court of Indiana, dividing 3–2, vacated the decision of the Court of Appeals, and denied Thomas benefits. 271 Ind. ——, 391 N. E. 2d 1127 (1979). With reference to the Indiana unemployment compensation statute, the court said:

"It is not intended to facilitate changing employment or to provide relief for those who quit work voluntarily for personal reasons. Voluntary unemployment is not compensable under the purpose of the Act, which is to provide benefits for persons unemployed through no fault of their own.

"Good cause which justifies voluntary termination must

---

[5] *Id.,* at 2a–3a (emphasis added by petitioner).

[6] The Review Board, like the referee, found that Thomas had left his job for religious reasons, *id.,* at 5a:

"The evidence of record indicates that claimant . . . left his employment voluntarily because his religious beliefs . . . would not allow him to continue to work producing arms . . . ."

be job-related and objective in character." *Id.,* at ——, 391 N. E. 2d, at 1129 (footnotes omitted).

The court held that Thomas had quit voluntarily for personal reasons, and therefore did not qualify for benefits. *Id.,* at ——, 391 N. E. 2d, at 1130.

In discussing the petitioner's free exercise claim, the court stated: "A personal philosophical choice rather than a religious choice, does not rise to the level of a first amendment claim." *Id.,* at ——, 391 N. E. 2d, at 1131. The court found the basis and the precise nature of Thomas' belief unclear—but it concluded that the belief was more "personal philosophical choice" than religious belief. Nonetheless, it held that, even assuming that Thomas quit for religious reasons, he would not be entitled to benefits: under Indiana law, a termination motivated by religion is not for "good cause" objectively related to the work.

The Indiana court concluded that denying Thomas benefits would create only an indirect burden on his free exercise right and that the burden was justified by the legitimate state interest in preserving the integrity of the insurance fund and maintaining a stable work force by encouraging workers not to leave their jobs for personal reasons.

Finally, the court held that awarding unemployment compensation benefits to a person who terminates employment voluntarily for religious reasons, while denying such benefits to persons who terminate for other personal but nonreligious reasons, would violate the Establishment Clause of the First Amendment.

The judgment under review must be examined in light of our prior decisions, particularly *Sherbert* v. *Verner,* 374 U. S. 398 (1963).

## II

Only beliefs rooted in religion are protected by the Free Exercise Clause, which, by its terms, gives special protection to the exercise of religion. *Sherbert* v. *Verner, supra; Wis-*

*consin* v. *Yoder,* 406 U. S. 205, 215–216 (1972). The determination of what is a "religious" belief or practice is more often than not a difficult and delicate task, as the division in the Indiana Supreme Court attests.[7] However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.

In support of his claim for benefits, Thomas testified:

"Q. And then when it comes to actually producing the tank itself, hammering it out; that you will not do. . . .

"A. That's right, that's right when . . . I'm daily faced with the knowledge that these are tanks . . . .

.     .     .     .     .

"A. I really could not, you know, conscientiously continue to work with armaments. It would be against all of the . . . religious principles that . . . I have come to learn . . . ." 271 Ind., at ——, 391 N. E. 2d, at 1132.

Based upon this and other testimony, the referee held that Thomas "quit due to his religious convictions."[8] The Review Board adopted that finding,[9] and the finding is not challenged in this Court.

The Indiana Supreme Court apparently took a different view of the record. It concluded that "although the claimant's reasons for quitting were described as religious, it was unclear what his belief was, and what the religious basis of his belief was."[10] In that court's view, Thomas had made a merely "personal philosophical choice rather than a religious choice."[11]

---

[7] See, *e. g., Torcaso* v. *Watkins,* 367 U. S. 488, 495 (1961); *United States* v. *Ballard,* 322 U. S. 78 (1944).

[8] See n. 4, and text at n. 5, *supra.*

[9] See n. 6, *supra.*

[10] 271 Ind., at ——, 391 N. E. 2d, at 1133.

[11] *Id.,* at ——, 391 N. E. 2d, at 1131.

In reaching its conclusion, the Indiana court seems to have placed considerable reliance on the facts that Thomas was "struggling" with his beliefs and that he was not able to "articulate" his belief precisely. It noted, for example, that Thomas admitted before the referee that he would not object to

"working for United States Steel or Inland Steel . . . produc[ing] the raw product necessary for the production of any kind of tank . . . [because I] would not be a direct party to whoever they shipped it to [and] would not be . . . chargeable in . . . conscience. . . ." 271 Ind., at ——, 391 N. E. 2d, at 1131.

The court found this position inconsistent with Thomas' stated opposition to participation in the production of armaments. But Thomas' statements reveal no more than that he found work in the roll foundry sufficiently insulated from producing weapons of war. We see, therefore, that Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs because the believer admits that he is "struggling" with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ.

The Indiana court also appears to have given significant weight to the fact that another Jehovah's Witness had no scruples about working on tank turrets; for that other Witness, at least, such work was "scripturally" acceptable. Intrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here, and the guarantee of free exercise is not limited to beliefs which are shared by all of the members

of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

The narrow function of a reviewing court in this context is to determine whether there was an appropriate finding that petitioner terminated his work because of an honest conviction that such work was forbidden by his religion. Not surprisingly, the record before the referee and the Review Board was not made with an eye to the microscopic examination often exercised in appellate judicial review. However, judicial review is confined to the facts as found and conclusions drawn. On this record, it is clear that Thomas terminated his employment for religious reasons.

## III

### A

More than 30 years ago, the Court held that a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program. A state may not

> "exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation." *Everson* v. *Board of Education,* 330 U. S. 1, 16 (1947) (emphasis deleted).

Later, in *Sherbert* the Court examined South Carolina's attempt to deny unemployment compensation benefits to a Sabbatarian who declined to work on Saturday. In sustaining her right to receive benefits, the Court held:

> "The ruling [disqualifying Mrs. Sherbert from benefits because of her refusal to work on Saturday in violation of her faith] forces her to choose between following the

precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship." 374 U. S., at 404.

The respondent Review Board argues, and the Indiana Supreme Court held, that the burden upon religion here is only the indirect consequence of public welfare legislation that the State clearly has authority to enact. "Neutral objective standards must be met to qualify for compensation." 271 Ind., at ——, 391 N. E. 2d, at 1130. Indiana requires applicants for unemployment compensation to show that they left work for "good cause in connection with the work." *Ibid.*

A similar argument was made and rejected in *Sherbert,* however. It is true that, as in *Sherbert,* the Indiana law does not *compel* a violation of conscience. But, "this is only the beginning, not the end, of our inquiry." 374 U. S., at 403–404. In a variety of ways we have said that "[a] regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Wisconsin* v. *Yoder,* 406 U. S., at 220. Cf. *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970).

Here, as in *Sherbert,* the employee was put to a choice between fidelity to religious belief or cessation of work; the coercive impact on Thomas is indistinguishable from *Sherbert,* where the Court held:

> "[N]ot only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable." 374 U. S., at 404.

Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies

718

such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

The respondents also contend that *Sherbert* is inapposite because, in that case, the employee was dismissed by the employer's action. But we see that Mrs. Sherbert was dismissed because she refused to work on Saturdays after the plant went to a 6-day workweek. Had Thomas simply presented himself at the Blaw-Knox plant turret line but refused to perform any assigned work, it must be assumed that he, like Sherbert, would have been terminated by the employer's action, if no other work was available. In both cases, the termination flowed from the fact that the employment, once acceptable, became religiously objectionable because of changed conditions.

## B

The mere fact that the petitioner's religious practice is burdened by a governmental program does not mean that an exemption accommodating his practice must be granted. The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest. However, it is still true that "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order . . . can overbalance legitimate claims to the free exercise of religion." *Wisconsin* v. *Yoder, supra,* at 215.

The purposes urged to sustain the disqualifying provision of the Indiana unemployment compensation scheme are twofold: (1) to avoid the widespread unemployment and the consequent burden on the fund resulting if people were permitted to leave jobs for "personal" reasons; [12] and (2) to

[12] A similar interest—the integrity of the insurance fund—was advanced and rejected in *Sherbert* v. *Verner*, 374 U. S. 398, 407 (1963).

avoid a detailed probing by employers into job applicants' religious beliefs. These are by no means unimportant considerations. When the focus of the inquiry is properly narrowed, however, we must conclude that the interests advanced by the State do not justify the burden placed on free exercise of religion.

There is no evidence in the record to indicate that the number of people who find themselves in the predicament of choosing between benefits and religious beliefs is large enough to create "widespread unemployment," or even to seriously affect unemployment—and no such claim was advanced by the Review Board. Similarly, although detailed inquiry by employers into applicants' religious beliefs is undesirable, there is no evidence in the record to indicate that such inquiries will occur in Indiana, or that they have occurred in any of the states that extend benefits to people in the petitioner's position. Nor is there any reason to believe that the number of people terminating employment for religious reasons will be so great as to motivate employers to make such inquiries.

Neither of the interests advanced is sufficiently compelling to justify the burden upon Thomas' religious liberty. Accordingly, Thomas is entitled to receive benefits unless, as the respondents contend and the Indiana court held, such payment would violate the Establishment Clause.

## IV

The respondents contend that to compel benefit payments to Thomas involves the State in fostering a religious faith. There is, in a sense, a "benefit" to Thomas deriving from his religious beliefs, but this manifests no more than the tension between the two Religious Clauses which the Court resolved in *Sherbert:*

"In holding as we do, plainly we are not fostering the 'establishment' of the Seventh-day Adventist religion

in South Carolina, for the extension of unemployment benefits to Sabbatarians in common with Sunday worshippers reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." *Sherbert* v. *Verner*, 374 U. S., at 409.

See also *Wisconsin* v. *Yoder*, 406 U. S., at 220–221; *Walz* v. *Tax Comm'n*, 397 U. S., at 668–669; *O'Hair* v. *Andrus*, 198 U. S. App. D. C. 198, 201–204, 613 F. 2d 931, 934–937 (1979) (Leventhal, J.).

Unless we are prepared to overrule *Sherbert, supra,* Thomas cannot be denied the benefits due him on the basis of the findings of the referee, the Review Board, and the Indiana Court of Appeals that he terminated his employment because of his religious convictions.

*Reversed.*

JUSTICE BLACKMUN joins Parts I, II, and III of the Court's opinion. As to Part IV thereof, he concurs in the result.

JUSTICE REHNQUIST, dissenting.

The Court today holds that the State of Indiana is constitutionally required to provide direct financial assistance to a person solely on the basis of his religious beliefs. Because I believe that the decision today adds mud to the already muddied waters of First Amendment jurisprudence, I dissent.

I

The Court correctly acknowledges that there is a "tension" between the Free Exercise and Establishment Clauses of the First Amendment of the United States Constitution. Although the relationship of the two Clauses has been the subject of much commentary, the "tension" is of fairly recent

vintage, unknown at the time of the framing and adoption of the First Amendment. The causes of the tension, it seems to me, are threefold. First, the growth of social welfare legislation during the latter part of the 20th century has greatly magnified the potential for conflict between the two Clauses, since such legislation touches the individual at so many points in his life. Second, the decision by this Court that the First Amendment was "incorporated" into the Fourteenth Amendment and thereby made applicable against the States, *Stromberg* v. *California,* 283 U. S. 359 (1931); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), similarly multiplied the number of instances in which the "tension" might arise. The third, and perhaps most important, cause of the tension is our overly expansive interpretation of *both* Clauses. By broadly construing both Clauses, the Court has constantly narrowed the channel between the Scylla and Charybdis through which any state or federal action must pass in order to survive constitutional scrutiny.

None of these developments could have been foreseen by those who framed and adopted the First Amendment. The First Amendment was adopted well before the growth of much social welfare legislation and at a time when the Federal Government was in a real sense considered a government of limited delegated powers. Indeed, the principal argument against adopting the Constitution *without* a "Bill of Rights" was not that such an enactment would be *undesirable,* but that it was *unnecessary* because of the limited nature of the Federal Government. So long as the Government enacts little social welfare legislation, as was the case in 1791, there are few occasions in which the two Clauses may conflict. Moreover, as originally enacted, the First Amendment applied only to the Federal Government, not the government of the States. *Barron* v. *Baltimore,* 7 Pet. 243 (1833). The Framers could hardly anticipate *Barron* being superseded by the "selective incorporation" doctrine adopted by the Court, a decision which greatly expanded the number of stat-

utes which would be subject to challenge under the First Amendment. Because those who drafted and adopted the First Amendment could not have foreseen either the growth of social welfare legislation or the incorporation of the First Amendment into the Fourteenth Amendment, we simply do not know how they would view the scope of the two Clauses.

## II

The decision today illustrates how far astray the Court has gone in interpreting the Free Exercise and Establishment Clauses of the First Amendment. Although the Court holds that a State is constitutionally required to provide direct financial assistance to persons solely on the basis of their religious beliefs and recognizes the "tension" between the two Clauses, it does little to help resolve that tension or to offer meaningful guidance to other courts which must decide cases like this on a day-by-day basis. Instead, it simply asserts that there is no Establishment Clause violation here and leaves the tension between the two Religion Clauses to be resolved on a case-by-case basis. As suggested above, however, I believe that the "tension" is largely of this Court's own making, and would diminish almost to the vanishing point if the Clauses were properly interpreted.

Just as it did in *Sherbert* v. *Verner,* 374 U. S. 398 (1963), the Court today reads the Free Exercise Clause more broadly than is warranted. As to the proper interpretation of the Free Exercise Clause, I would accept the decision of *Braunfeld* v. *Brown,* 366 U. S. 599 (1961), and the dissent in *Sherbert.* In *Braunfeld,* we held that Sunday closing laws do not violate the First Amendment rights of Sabbatarians. Chief Justice Warren explained that the statute did not make unlawful any religious practices of appellants; it simply made the practice of their religious beliefs more expensive. We concluded that "[t]o strike down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, *i. e.* legislation which does not

make unlawful the religious practice itself, would radically restrict the operating latitude of the legislature." 366 U. S., at 606. Likewise in this case, it cannot be said that the State discriminated against Thomas on the basis of his religious beliefs or that he was denied benefits *because* he was a Jehovah's Witness. Where, as here, a State has enacted a general statute, the purpose and effect of which is to advance the State's secular goals, the Free Exercise Clause does not in my view require the State to conform that statute to the dictates of religious conscience of any group. As Justice Harlan recognized in his dissent in *Sherbert* v. *Verner, supra:* "Those situations in which the Constitution may require special treatment on account of religion are . . . few and far between." *Id.,* at 423. Like him I believe that although a State could choose to grant exemptions to religious persons from state unemployment regulations,[1] a State is not constitutionally compelled to do so. *Id.,* at 422–423.[2]

---

[1] Even if I were to agree that *Sherbert* was correctly decided, I still would dissent on the grounds that today's decision unjustifiably extends *Sherbert.* The Indiana Employment Security Act, Ind. Code § 22–4–15–1 (Supp. 1978), provides that an "individual who has voluntarily left his employment without good cause in connection with his employment" is disqualified from receiving benefits. In this case, the Supreme Court of Indiana "found the basis and the precise nature of Thomas' belief unclear" and concluded that the belief was more "personal philosophical choice" than religious belief. *Ante,* at 713. The Court's failure to make clear whether it accepts or rejects this finding by the Indiana Supreme Court, the highest court of the State, suggests that a person who leaves his job for purely "personal philosophical choices" will be constitutionally entitled to unemployment benefits. If that is true, the implications of today's decision are enormous. Persons will then be able to quit their jobs, assert they did so for personal reasons, and collect unemployment insurance. We could surely expect the State's limited funds allotted for unemployment insurance to be quickly depleted.

In addition, the Court's opinion in *Sherbert,* 374 U. S., at 401, n. 4, seems to suggest by negative implication that where a State makes every "personal reason" for leaving a job a basis for disqualification from unemploy-

724

The Court's treatment of the Establishment Clause issue is equally unsatisfying. Although today's decision requires a State to provide direct financial assistance to persons solely on the basis of their religious beliefs, the Court nonetheless blandly assures us, just as it did in *Sherbert,* that its decision "plainly" does not foster the "establishment" of religion. *Ante,* at 719. I would agree that the Establishment Clause, properly interpreted, would not be violated if Indiana volun-

ment benefits, the State need not grant an exemption to persons such as Sherbert who do quit for "personal reasons." In this case, the Indiana Supreme Court *has* construed the State's unemployment statute to make every personal subjective reason for leaving a job a basis for disqualification. *E. g., Geckler* v. *Review Bd. of the Indiana Employment Security Div.,* 244 Ind. 473, 193 N. E. 2d 357 (1963). This case is thus distinguishable from *Sherbert.* Because Thomas left his job for a personal reason, the State of Indiana should not be prohibited from disqualifying him from receiving benefits.

[2] To the extent *Sherbert* was correctly decided, it might be argued that cases such as *McCollum* v. *Board of Education,* 333 U. S. 203 (1948); *Engel* v. *Vitale,* 370 U. S. 421 (1962); *Abington School District* v. *Schempp,* 374 U. S. 203 (1963); *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971); and *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973), were wrongly decided. The "aid" rendered to religion in these latter cases may not be significantly different, in kind or degree, than the "aid" afforded Mrs. Sherbert or Thomas. For example, if the State in *Sherbert* could not deny compensation to one refusing work for religious reasons, it might be argued that a State may not deny reimbursement to students who choose for religious reasons to attend parochial schools. The argument would be that although a State need not allocate any funds to education, once it has done so, it may not require any person to sacrifice his religious beliefs in order to obtain an equal education. See *Lemon, supra,* at 665 (opinion of WHITE, J.); *Nyquist, supra,* at 798–805 (opinion of BURGER, C. J.). There can be little doubt that to the extent secular education provides answers to important moral questions without reference to religion or teaches that there are no answers, a person in one sense sacrifices his religious belief by attending secular schools. And even if such "aid" were not constitutionally compelled by the Free Exercise Clause, Justice Harlan may well have been right in *Sherbert* when he found sufficient flexibility in the Establishment Clause to permit the States to voluntarily choose to grant such benefits to individuals.

tarily chose to grant unemployment benefits to those persons who left their jobs for religious reasons. But I also believe that the decision below is inconsistent with many of our prior Establishment Clause cases. Those cases, if faithfully applied, would require us to hold that such voluntary action by a State *did* violate the Establishment Clause.

JUSTICE STEWART noted this point in his concurring opinion in *Sherbert,* 374 U. S., at 414–417. He observed that decisions like *Sherbert,* and the one rendered today, squarely conflict with the more extreme language of many of our prior Establishment Clause cases. In *Everson* v. *Board of Education,* 330 U. S. 1 (1949), the Court stated that the Establishment Clause bespeaks a "government . . . stripped of all power . . . to support, or otherwise to assist any or all religions . . . ," and no State "can pass laws which aid one religion . . . [or] all religions." *Id.,* at 11, 15. In *Torcaso* v. *Watkins,* 367 U. S. 488, 495 (1961), the Court asserted that the government cannot "constitutionally pass laws or impose requirements which aid all religions as against non-believers." And in *Abington School District* v. *Schempp,* 374 U. S. 203, 217 (1963), the Court adopted Justice Rutledge's words in *Everson* that the Establishment Clause forbids " 'every form of public aid or support for religion.' " See also *Engel* v. *Vitale,* 370 U. S. 421, 431 (1962).

In recent years the Court has moved away from the mechanistic "no-aid-to-religion" approach to the Establishment Clause and has stated a three-part test to determine the constitutionality of governmental aid to religion. See *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971); *Committee for Public Education* v. *Nyquist,* 413 U. S. 756, 772–773 (1973). First, the statute must serve a secular legislative purpose. Second, it must have a "primary effect" that neither advances nor inhibits religion. And third, the State and its administration must avoid excessive entanglement with religion. *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970).

It is not surprising that the Court today makes no attempt to apply those principles to the facts of this case. If Indiana were to legislate what the Court today requires—an unemployment compensation law which permitted benefits to be granted to those persons who quit their jobs for religious reasons—the statute would "plainly" violate the Establishment Clause as interpreted in such cases as *Lemon* and *Nyquist*. First, although the unemployment statute as a whole would be enacted to serve a secular legislative purpose, the proviso would clearly serve only a religious purpose. It would grant financial benefits for the sole purpose of accommodating religious beliefs. Second, there can be little doubt that the primary effect of the proviso would be to "advance" religion by facilitating the exercise of religious belief. Third, any statute including such a proviso would surely "entangle" the State in religion far more than the mere grant of tax exemptions, as in *Walz*, or the award of tuition grants and tax credits, as in *Nyquist*. By granting financial benefits to persons solely on the basis of their religious beliefs, the State must necessarily inquire whether the claimant's belief is "religious" and whether it is sincerely held. Otherwise any dissatisfied employee may leave his job without cause and claim that he did so because his own particular beliefs required it.

It is unclear from the Court's opinion whether it has temporarily retreated from its expansive view of the Establishment Clause, or wholly abandoned it. I would welcome the latter. Just as I think that Justice Harlan in *Sherbert* correctly stated the proper approach to free exercise questions, I believe that JUSTICE STEWART, dissenting in *Abington School District* v. *Schempp, supra,* accurately stated the reach of the Establishment Clause. He explained that the Establishment Clause is limited to "government support of proselytizing activities of religious sects by throwing the weight of secular authorit[ies] behind the dissemination of religious tenets." *Id.,* at 314. See *McCollum* v. *Board of Education,* 333 U. S. 203, 248 (1948) (Reed, J., dissenting)

(impermissible aid is only "purposeful assistance directly to the church itself or to some religious group . . . performing ecclesiastical functions"). Conversely, governmental assistance which does not have the effect of "inducing" religious belief, but instead merely "accommodates" or implements an independent religious choice does not impermissibly involve the government in religious choices and therefore does not violate the Establishment Clause of the First Amendment. I would think that in this case, as in *Sherbert,* had the State voluntarily chosen to pay unemployment compensation benefits to persons who left their jobs for religious reasons, such aid would be constitutionally permissible because it redounds directly to the benefit of the individual. Accord, *Wolman* v. *Walter,* 433 U. S. 229 (1977) (upholding various disbursements made to pupils in parochial schools).

In sum, my difficulty with today's decision is that it reads the Free Exercise Clause too broadly and it fails to squarely acknowledge that such a reading conflicts with many of our Establishment Clause cases. As such, the decision simply exacerbates the "tension" between the two Clauses. If the Court were to construe the Free Exercise Clause as it did in *Braunfeld* and the Establishment Clause as JUSTICE STEWART did in *Schempp,* the circumstances in which there would be a conflict between the two Clauses would be few and far between. Although I heartily agree with the Court's tacit abandonment of much of our rhetoric about the Establishment Clause, I regret that the Court cannot see its way clear to restore what was surely intended to have been a greater degree of flexibility to the Federal and State Governments in legislating consistently with the Free Exercise Clause. Accordingly, I would affirm the judgment of the Indiana Supreme Court.