Carl L. **CLARK**, II, Appellant,

v.

**REVIEW BOARD OF the DEPARTMENT OF EMPLOYMENT AND TRAINING SERVICES; John C. Mowrer, Chairman; Joe A. Harris, Member; Nanette L. McDermott, Member; and Firestone Tire and Rubber Company, Appellees.**

No. 93A02–8808–EX–323.

Court of Appeals of Indiana,
Fourth District.

Feb. 21, 1989.

John Jay Boyce, Certified Legal Intern, William E. Marsh, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Lisa Anne McCoy, Deputy Atty. Gen., Office of Attorney General, Indianapolis, for appellees.

---

**1.** Appellant's motion to strike appellee's brief is granted.

MILLER, Judge.

Carl L. Clark appeals the decision of the Review Board of the Department of Employment and Training Services denying him benefits under the Indiana Employment Security Act. The Board found he quit his job without good cause, relying primarily on the fact that after discovering his job at Firestone Tire and Rubber Co. involved assembling tank treads for military use he remained on the job for several weeks before seeking a transfer. Clark claimed he left work because of his religious beliefs and under the authority of *Thomas v. Review Board of the Indiana Employment Security Division* (1980), 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624, unemployment benefits cannot be denied. Under the facts in this case, we agree with Clark and reverse.

## DECISION

With the exception of one minor correction, the Review Board adopted the findings of fact and conclusions of law of the Appeals Referee which were as follows:

"Both parties were heard on the claimant's appeal to an initial determination issued April 21, 1988, holding that the claimant left his employment on April 6, 1988, voluntarily without good cause in connection with the work under Chapter 15–1 of the Act.

The claimant was employed from January 25, 1988 until April 6, 1988, his date of separation. His last day worked was April 4, 1988. At separation, the claimant was working as a miscellaneous finishing laborer (union) on the 7:00 A.M. to 3:00 P.M. shift, five (5) days per week, at an hourly rate of six dollars and twenty-five cents ($6.25).[1]

Under the union contract, new hires are eligible for union membership after thirty (30) calendar days of employment; new hires are eligible for permanent status after a probationary period of sixty (60) working days; an employee must be employed in a department; an employee must be employed for one (1) year before he has any bid rights in another department.

The employer has government contracts for military equipment. At the time of hire, the claimant was assigned to work assembling tracks (treads). *Although he was not aware at the time of hire that he was assembling tank tracks, the claimant found out that he was assembling tank tracks a few weeks after his hire.* The claimant is a Jehovah's Witness. As a Jehovah's Witness, it is against the claimant's religious beliefs to engage in the production of any military killing equipment; however, the claimant decided to wait and complete his probationary period and achieve permanent status as an employee before protesting his work assignment. The claimant joined the union after thirty (30) calendar days of employment, but decided not to go through his union on the matter of his protest to his work assignment.

On Friday, April 1, 1988, the claimant approached his supervisor and informed his supervisor that it was against his religious beliefs to engage in the production of any product which constituted military killing equipment. Because he was not familiar with the bid right requirements in the union contract, he asked his supervisor if there was another job that he could be transferred to that would not be involved in such production. His supervisor told him that there were (2) openings on the press line on the third shift. He further stated that he thought that the claimant could transfer to that work. On Monday, April 4, 1988, there was a second meeting which involved the claimant's foreman. The claimant was informed that his supervisor had no authority to transfer the claimant to the press line openings on the third shift, because the claimant did not qualify to bid on those openings under the seniority provisions in the union contract. The claimant then reconsidered and stated that he would return to his regular work on his regular shift and that he would work until his seniority qualified him to bid on other work in the plant. The

---

1. The Review Board corrected this to read "at an hourly rate of over nine dollars ($9.00)."

claimant was represented by his union steward at the April 4, 1988 meeting. As of that date, the claimant had worked fifty-eight (58) days of the sixty (60) day probationary period. A meeting was set up with Personnel for April 6, 1988. On that date, the claimant had achieved permanent status as an employee. In the presence of union and management representatives, the claimant stated that he had reconsidered after consultation with elders and his wife and that he had decided to discontinue his employment because of his religious beliefs. At that time, the claimant's job as a miscellaneous finishing laborer assembling tank track was available.

The claimant contends that his leaving of work was forced and that since he left work because of his religious beliefs, unemployment benefits cannot be denied under the authority of *Thomas v. Review Board, Indiana Employment Security Division* (1981), 450 U.S. 707 [101 S.Ct. 1425, 67 L.Ed.2d 624].

In the *Thomas* case, the claimant was a Jehovah's Witness working in the employer's foundry fabricating sheet metal. The foundry was closed. The claimant was involuntarily transferred to a department that manufactured gun turrets for tanks. The claimant refused the involuntary transfer because of his religious beliefs and became unemployed. The United States Supreme Court held that the claimant in that case could not be denied unemployment benefits because such a denial would require that he choose between his religious beliefs and his job. *In this case, the claimant made his choice a few weeks after beginning his employment with this employer when he learned that he was assembling tank tracks. He elected to continue doing that work without protest until he completed his probationary period and had permanent status as an employee. By so doing, the claimant knowingly compromised his religious beliefs as they pertained to involvement in the production of military killing equipment and continued working until he could achieve an employment status with the employer that might qualify him to change jobs.* He was not familiar with the bid right requirements of the union contract and apparently thought that he could change jobs once he achieved permanent status as an employee. The claimant does not fall within the rule of *Thomas v. Review Board, Indiana Employment Security Division, supra,* since the claimant voluntarily elected to continue working in a job that violated his religious beliefs. He was not involuntarily assigned to that type of work by his employer and given the choice of either accepting the work or termination. This being the case, it is held that the claimant left his employment voluntarily and for subjective personal reasons not objectively related to the employment and, therefore, without good cause in connection with the work under Chapter 15–1 of the Act." (Our emphasis)

(Transcript, p. 10–11).

Clark asserts the Board's decision was incorrect as a matter of law based on the Supreme Court's decisions in *Thomas v. Review Board of the Indiana Employment Security Division* (1980), 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 and *Hobbie v. Unemployment Appeals Commission of Florida* (1987), 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190. The Board argues *Thomas* and *Hobbie* are distinguishable from this case, because Clark continued to work for a period of several weeks after discovering the job violated his religious beliefs.

We fail to see a distinction and hold *Thomas* and *Hobbie* are controlling precedent. It is undisputed Clark did not know at the time he was hired that he would be making tracks for a military purpose. At some point during the two months between his hiring date and his request for a transfer he discovered the nature of his work. The Board found Clark discovered the nature of the work a "few" weeks after he started working.[2] Clark's testimony con-

---

**2.** As we noted in *Indiana State Board of Health v. B & H Packing Co.* (1979), 181 Ind.App. 171,

cerning the time at which he discovered the nature of his work is as follows:

"Q. Alright, and at some point in time, did you determine that it was exclusively tank track?

A. Only after several weeks, and I kind of asked questions around. I asked a couple of inspectors.

Q. Okay. Now when you found out that you were assembling track that was to be used exclusively for military tanks, what did you do?

A. Well, when I found out there was no ... there was nothing else that it could be used for, I talked it over with my wife, and I talked it over with my minister and at that time, there was a very short period of time left till my probation was over. And I was....

Q. How long was the probation?

A. Ninety days,[3] but there's ... I know there's a ... there's a time there, but....

Q. Well, I have a problem here. I've got you on the job then several ... you suspected that the track might be used for tanks, but you confirmed it several weeks ... you said several weeks later, but ninety days is ... is twelve weeks. At what point in your ninety day probation did you determine that this was ... could be exclusively used for military tanks?

A. Well, it had to be closer to the end of that ninety day period. Time went by pretty quick. And I ... like I say at first I didn't think that ... I thought it could be used for other things other...."

Q. I understand that, but I'm trying to get a time frame here.

A. Alright. Let's ... I would say ...

Q. And at some point....

A. A couple of weeks maybe before the ninety day period was up."

Transcript, p. 32.

There was some evidence Clark should have been told about the military application of his work at an orientation meeting, which was held approximately thirty days after he began work.[4] The record suggests Clark knew the nature of his work for several weeks, or possibly as much as a month before he requested a transfer. Clark indicated he discussed the problem with his wife and minister and decided to wait until the end of his probationary period which he indicated was only a short time, in order to qualify for a transfer and to establish a good work record. In explaining why he did not initially work through his union in seeking transfer he said: "I wanted to—I was trying to show that—you know—that I was sincere, and I wanted to spend the rest of my working career at that—at Firestone...." Transcript, p. 35.

The facts in this case are remarkably similar to the facts in *Thomas, supra.* In *Thomas*, the claimant, a Jehovah's Witness, had worked for Blaw–Knox in the roll foundry for approximately one year. The roll foundry was closed and Blaw–Knox tranferred Thomas to a department which made turrets for military tanks. Thomas realized the first day on the job that the work was weapon related and probably violated his religious beliefs. He worked there for two or three weeks[5] while search-

---

**391 N.E.2d 620, 623:**
"The word 'few' is relative, very indefinite and vague, *Indianapolis St. Railway Co. v. Robinson* (1901), 157 Ind. 414, 61 N.E. 936. *See Pittsburgh, Chicago, and St. Louis Railway Co. v. Broderick* (1913), 56 Ind.App. 58, 102 N.E. 887; *Also Black's Law Dictionary,* 750 (4th ed. 1951). It could refer to perhaps three or as many as five hundred depending on the context in which it is used. *Indianapolis St. Railway Co. v. Robinson, supra.*"

3. Later testimony revealed the probationary period was actually sixty working days, not ninety.

4. Clark denied this was mentioned in the meeting.

5. The Supreme Court quoted the Board's finding in *Thomas:*
   "The evidence reveals that approximate [sic] two to three weeks prior to claimant's date of leaving, the 'Roll Foundry' was closed permanently and claimant was transferred to the terret [sic] line. [He], at this time, real [sic] realized that all of the other functions at the Blaw–Knox Company were engaged in producing arms for the Armament Industry." *Thomas* 450 U.S. at 711, n. 4, 101 S.Ct. at 1428, n. 4.
   In the case before us, the Board's findings glossed over the significant fact that Thomas continued working for two or three weeks and did not initially refuse the transfer. That por-

ing for another position with Blaw–Knox which would not be armament related. After finding no such work as available, he asked for a lay-off and, when this was refused, quit because of his religious convictions. *Thomas, supra.*

The Supreme Court found no significance in the fact that he struggled with his beliefs before ultimately making his decision and did not consider the weeks of indecision as compromising his beliefs. The Court said:

"In reaching its conclusion, the Indiana court seems to have placed considerable reliance on the facts that Thomas was 'struggling' with his beliefs and that he was not able to 'articulate' his belief precisely. It noted, for example, that Thomas admitted before the referee that he would not object to

'working for United States Steel or Inland Steel ... produc[ing] the raw product necessary for the production of any kind of tank ... [because I] would not be a direct party to whoever they shipped it to [and] would not be ... chargeable in ... conscience....' [(1979)] Ind., 391 N.E.2d [1127] at 1131.

The court found this position inconsistent with Thomas' stated opposition to participation in the production or armaments. But Thomas' statements reveal no more than that he found work in the roll foundry sufficiently insulated from producing weapons of war. We see, therefore, that Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one. Courts should not undertake to dissect religious beliefs

because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ."

The Indiana court also appears to have given significant weight to the fact that another Jehovah's Witness had no scruples about working on tank turrets; for that other Witness, at least, such work was 'scripturally' acceptable. Intrafaith differences of that kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; but that is not the case here, and the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial compentence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas,* 450 U.S. at 715–16, 101 S.Ct. at 1430–31.

In this case, the Board found: "the claimant knowingly compromised his religious beliefs as they pertained to involvement in the production of military killing equipment...." We believe this is precisely the sort of arbitration of religious belief the Supreme Court disapproved in *Thomas.*

---

tion of our Board's findings which purports to analyze the facts in *Thomas* stated that Thomas "was involuntarily transferred to a department that manufactured gun turrets for tanks. The claimant refused the involuntary transfer because of his religious beliefs and became unemployed." (Transcript, p. 11).

The Supreme Court, at another point in its opinion, again noted that Thomas did not initially reject the transfer. In pointing out that the coercive impact of Thomas was indistinguishable from the coercive impact of the employee in *Sherbert v. Verner* (1963), 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (where Seventh Day Adventist Sherbert was fired because

she refused to work on her sabbath) the court observed:

"The respondents also contend that *Sherbert* is inapposite because, in that case, the employee was dismissed by the employer's action. But we see that Mrs. Sherbert was dismissed because she refused to work on Saturday after the plant went to a 6-day workweek. *Had Thomas simply presented himself at the Blaw–Knox plant turret line but refused to perform any assigned work,* it must be assumed that he, like Sherbert, would have been terminated by the employer's action, if no other work was available." *Id.* 450 U.S. at 718, 101 S.Ct. at 1432.

Under the facts here, neither the Board nor this court is competent to determine if Clark "knowingly compromised his religious beliefs."

The Board suggests that in *Thomas* the employee was switched from one job to another, and the fact that the job had changed is sufficient to distinguish *Thomas* from this case. However, the language in *Hobbie, supra,* does not support this conclusion. In *Hobbie,* the employee had worked in a retail jewelry store for over two years. The job required that she sometimes work on Friday evening and Saturday. She was baptized into the Seventh–Day Adventist Church and because of her religious beliefs could no longer work from sundown on Friday to sundown on Saturday. Her employment was terminated because she refused to work during those times. The Court held:

> "The First Amendment protects the free exercise rights of employees who adopt religious beliefs or convert from one faith to another after they are hired."

*Id.* 107 S.Ct. at 1051. The court also noted:

> "So long as one's faith is religiously based *at the time it is asserted,* it should not matter, for constitutional purposes, whether the faith derived from revelation, study, upbringing, gradual evolution or some source that appears entirely incomprehensible." (Our emphasis)

*Id.* n. 9 (quoting *Callahan v. Woods* (9th Cir.1981). 658 F.2d 679, 687). Thus, *Hobbie* is representative of a case where the job did not change; the beliefs of the employee did.

The Review Board found Clark terminated his employment because it violated his religious beliefs. The fact that he waited two or three weeks after his discovery while considering his decision and discussing it with members of his church does not sufficiently distinguish this case from *Thomas.* Under *Thomas* and *Hobbie,* the Review Board's decision was improper as a matter of law.

REVERSED.

SHIELDS, P.J., concurs.

CONOVER, P.J., concurs in result.