FILED
United States Court of Appeals
Tenth Circuit

June 9, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MICHAEL LEE STROPE, a/k/a
Gordon Strope,

        Plaintiff-Appellant,

v.

WILLIAM CUMMINGS, Kansas
Department of Corrections, in his
individual capacity; DAVID R.
MCKUNE, Warden, Lansing
Correctional Facility, in his individual
capacity; COLLETTE
WINKLEBAUER, Lansing
Correctional Facility, in her individual
capacity; DANIELLE WAGNER,
Lansing Correctional Facility, in her
individual capacity; (FNU) THEISEN,
Correctional Officer I, Lansing
Correctional Facility, in his individual
capacity; (FNU) JACKSON, Kitchen
Supervisor, Lansing Correctional
Facility, in her individual capacity,

        Defendants-Appellees.

No. 09-3306
(D.C. No. 5:05-CV-03385-SAC)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent

(continued...)

Before **McKAY**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **EBEL**, Circuit Judge.

Plaintiff Michael Lee Strope appeals from the grant of summary judgment to defendants in this prison civil rights action involving conditions at the Lansing Correctional Facility (LCF) in Kansas, brought under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5. His amended complaint set out twenty counts, but, as the district court noted, these clustered into six basic claims involving events at LCF in the summer of 2005. Of these, only three are specifically argued on appeal: (1) deficiencies in the kosher diet at LCF; (2) interference with access to scheduled religious services; and (3) retaliatory transfer between cell units.[1] Aplt. Br. at 2, supp. to page 3. Focusing on the disposition of these three claims, we affirm for substantially the reasons stated by the district court.

---

[*](...continued)
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] Mr. Strope also contends more generally that the district court improperly "tr[ied] the case on prison official's grievance responses." Aplt. Br. at 2. This broad-brush objection is both inaccurate and analytically superfluous. Although he initially cites in perfunctory fashion to counts "1, 2, 3, 4, 5, 6, 9, 10, 11, 12, 13, 16, 17, 18, 19, and 20" in his "argument and authorities" for this issue, he limits his discussion of specifics to the same three claims listed above. *Id.,* supp. to page 3. Our review of the district court's disposition of these claims on the merits necessarily includes consideration of its treatment of evidentiary materials, which we conclude was proper in all material respects.

Our standard of review is well-settled:

> We review the grant of summary judgment de novo, applying the same standard the district court should apply under Fed.R.Civ.P. 56(c). For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment. Evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise. Unsubstantiated allegations carry no probative weight in summary judgment proceedings.

*Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (quotations, citations, and alterations omitted). While we liberally construe the pleadings of the pro se plaintiff, "we do not act as his advocate." *Id.* "Thus, although we make some allowances for [his] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements, the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quotation, citation, and alterations omitted). With these standards in mind, we address the claims presented for our review.

### Deficiencies in the Kosher Diet at LCF

Mr. Strope claims that deficiencies in LCF kosher meals served during the summer of 2005 violated both his right to the free exercise of his religion and his Eighth Amendment right to an adequate diet. Much of his objection to the diet

-3-

has been advanced in general terms: kosher meals were less varied than the regular meals, had a paucity of seasonal fruits and vegetables, included wilted or even rotten items on occasion, and entirely lacked certain items found on the regular menu.[2] The specific instances gleaned from his pleadings and grievances cited therein are: (1) on June 27, Strope received a warm sandwich (that should have been "cool/crisp"), along with a "green orange" and a "nasty" carrot/cabbage salad, R. vol. 1 at 67; (2) on June 30, he was served salad dressing that was not kosher, *id.* at 90; and (3) lunch on July 16 included a salad that was "rotted and clearly smelled spoiled," *id.* at 80. Grievances attached to but not cited in the complaint add: (4) on July 4, the regular line had a holiday meal with ice cream but the kosher line did not, even though the ice cream was kosher (the prison explained that the ice cream could not be given to the kosher line, which already was being served meat and therefore could not be served a dairy product), *id.* at 70-72; (5) a July 10 grievance over the lack of meal rotation complained of two consecutive chicken suppers and three rice/soy bean meals in the last several days (the prison noted that the former were different chicken dishes and the latter included soy chili and red beans and rice dishes), *id.* at 78; (6) on July 11, he was

[2]    One grievance complained that "we [on the kosher diet] never receive macaroni salad or potato salad, cucumbers, peppers, or tomatoes, watermelon, cantaloupe or baked potatoes." R. vol. 1 at 66. Macaroni salad seems to be of particular significance to Mr. Strope. An early response to one of his grievances noted that he had been "advised to submit a request to Aramark [LCF's vendor for food service] to see if macaroni salad could be added to the [kosher] menu [for] . . . the next seasonal menu." R. vol. 1 at 61.

served a "cold tray" that was warm with wilted carrot sticks, *id.* at 81; and (7) on July 14, he received a turkey sandwich and rotted orange, while the regular line had a full balanced tray with macaroni salad, *id.* at 79.

Mr. Strope's primary claim here is that the inadequacies in the kosher diet burdened his religious observance, violating the Free Exercise Clause and the RLUIPA. While the analysis under these authorities differs in some respects, the principle dispositive here is the same: Strope must show that defendants' conduct imposed a *substantial burden* on his religious practice. *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1312-15 (10th Cir. 2010) (applying RLUIPA); *Gallagher v. Shelton*, 587 F.3d 1063, 1069-70 (10th Cir. 2009) (applying Free Exercise Clause). The district court held that Strope's scattered and minor complaints about kosher meals were insufficient as a matter of law to show that defendants had imposed a substantial burden on his religious exercise. We agree.

In *Abdulhaseeb* we identified three broad ways government action may impose a substantial burden on religious exercise:

> (1) requir[ing] participation in an activity prohibited by a sincerely held religious belief, or (2) prevent[ing] participation in conduct motivated by a sincerely held religious belief, or (3) plac[ing] substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice-an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief.

600 F.3d at 1315. The first two are clearly not applicable here.

As for the third, we explained the concept of "substantial pressure" in terms of coercion created by the conditional receipt or denial of an *important benefit*:

> "[W]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."

*Id.* (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)). We cautioned that not "every infringement on a religious exercise will constitute a substantial burden," reinforcing the point with a quote from *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007): "[A]t a minimum the substantial burden test requires . . . more than an inconvenience to one's religious practice." *Abdulhaseeb*, 600 F.3d at 1316. Illustrating the distinction between substantial burden and inconvenience, we held (1) the flat denial of a halal diet with approved meats was actionable, *id.* at 1316-20, but (2) an incident (the panel concurrence notes "sporadic incidents") in which a prisoner's meal was rendered inedible by service of prohibited items contaminating his tray was not actionable, *id.* at 1320-21; *id.* at 1325; *see also Gallagher*, 587 F.3d at 1070 (holding isolated violation of kosher restrictions did not support Free Exercise claim). We "assume[d] that as the frequency of presenting unacceptable foods increases, at some point the situation would rise to the level of a substantial burden," but that level had clearly not been reached. *Abdulhaseeb,* 600 F.3d at 1321.

-6-

Neither has that level been reached here. The complaints summarized above reflect the inconvenience of non-preferred or occasionally unsatisfactory items in a meal. We cannot say that they constituted a substantial burden on Mr. Strope's practice of maintaining a kosher diet. While there were perhaps more instances involved here than in *Abdulhaseeb*, none were shown to have completely denied an edible meal to the prisoner, so in that respect the burden was lighter here than the burden deemed insubstantial in *Abdulhaseeb*. As for his broader complaints about the variety, quality, and rotation of the menu, such general allegations are insufficient at the summary judgment stage, where "[t]he purpose . . . is to determine whether there is evidence to support a party's factual claims" and "[u]nsupported conclusory allegations . . . do not create a genuine issue of fact." *Abdulhaseeb*, 600 F.3d at 1321 (quotation omitted).

Mr. Strope's alternative reliance on the Eighth Amendment does not obviate the deficiency in his case regarding the diet at LCF. Indeed, the relevant aspect of the Eighth Amendment standard is, if anything, considerably lower, guaranteeing inmates merely "the basic necessities of [nutritionally] adequate food." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006) (quotation omitted). Whatever complaints Strope may have voiced regarding the content, variety, and preparation of the kosher menu, he has not shown that it failed to provide a nutritionally adequate diet.

**Interference with Access to Religious Services**

LCF accommodates the religious needs of inmates through the use of a "call out" system. Religious groups schedule services and maintain lists of the inmates authorized to attend. The services for Mr. Strope's group were scheduled for 8:30 to 9:30 a.m. on Saturdays and 6:15 to 8:15 p.m. on Tuesdays, and he was on the call-out list for these times. However, following his transfer from the D-Cell House to the IMU (segregation) unit in A-Cell House in July, Mr. Strope was denied a call-out on three consecutive Tuesday nights, being told that he was not on the applicable list. R. vol. 1 at 94-96. He also missed much of one Saturday morning service, because the call-out was posted late. *Id.* In response to his grievance over these matters, prison officials verified that he was on the call-out list for A-Cell House, told him measures had been taken to ensure that the list would be posted and followed, and apologized for the misunderstanding. *Id.* at 94-95, 97.

On appeal, Strope refers to this episode as an example of retaliation for filing grievances, though in his pleadings he also complained of the burden it placed on his Free Exercise rights, which is how the district court analyzed the claim. As it happens, not only is the claim deficient from a retaliation standpoint, but that deficiency also bolsters the district court's rationale for rejecting it under Free Exercise principles.

Strope's attribution of retaliatory motive is conjectural and conclusory. "An inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of [his] constitutional rights." *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (quotation omitted) (also noting that retaliation claim is governed by strict "but for" standard for causation). Strope does not cite any evidence supporting his speculative accusation of retaliation. While he undeniably engaged in protected activity–he has pursued a plethora of prison grievances and lawsuits over the years–that alone does not establish the requisite causal connection for his retaliation claim. If it did, litigious prisoners could claim retaliation over every perceived slight and resist summary judgment simply by pointing to their litigiousness. "Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity." *Id.* Moreover, we have consistently held that temporal proximity between protected activity and a challenged prison action does not, in itself, demonstrate the causal nexus for a retaliation claim. *See, e.g.*, *Friedman v. Kennard*, 248 F. App'x 918, 922 (10th Cir. 2007) (citing cases). Indeed, even outside the prison context, temporal proximity per se is insufficient to show that the stated explanation for a challenged action is pretextual. *See, e.g.*, *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009).

We are thus left with defendants' explanation indicating that the problems with Strope's call-outs reflected nothing more than isolated mistakes, which clearly warrants the entry of summary judgment for defendants on Strope's retaliation claim. And, as we have already noted, an isolated mistake is also not an actionable basis for a Free Exercise claim. *See Abdulhaseeb*, 600 F.3d at 1320-21, 1325; *Gallagher*, 587 F.3d at 1070.

### Retaliatory Inter-Unit Transfer

Strope's retaliatory-transfer claim suffers from the same basic evidentiary deficiency. Once again based primarily on his own litigiousness, he conjectures that his transfer from D-Cell House to A-Cell House in early July was done in retaliation for the exercise of constitutional rights. Defendants, on the other hand, offered a legitimate and facially plausible explanation for the transfer: to reunite the discontented Strope with a particular counselor with whom he had a good relationship before the counselor was transferred from D-Cell House to A-Cell House earlier in 2005. *See* R. vol. 1 at 46-49; R. vol. 2 at 152-53.

In this instance, however, Strope seeks to bolster his case by referring to an affidavit submitted in response to defendants' motion for summary judgment, in which he stated that two of the defendants met with him on June 15, 2005 "to instruct/reprimand [him] for the filing of numerous grievances, and did in fact tell [him] to quit filing said grievances on Aramark or he would be transferred." R. vol. 2 at 167. The following circumstances make this self-serving statement

-10-

unusually dubious: (1) Strope said nothing about this threat in his grievances over the transfer; (2) he specifically recounted the June 15 meeting in another grievance, where he noted the parties discussed kosher diet issues, but did not mention anything about a threat; (3) the threat is not mentioned in his complaint or amended complaint; (4) in his answer to interrogatories asking for the facts underlying his retaliatory-transfer claim, he just referred defendants to his complaint and grievances and said nothing about a threat; (5) only after defendants moved for summary judgment did he prepare the affidavit–nearly four years after the fact–and introduce for the first time this alleged threat that one would expect to see foregrounded from the outset. In contrast, from their first response to Strope's grievances, defendants have consistently and plausibly maintained that Strope was transferred to facilitate his counseling. Keeping in mind the rigorous burden placed on Strope to show not only that a retaliatory motive may have played some role in his transfer but that such a motive was the strict but-for cause of his transfer, *Peterson*, 149 F.3d at 1144, we conclude that he has failed to make the necessary showing on this element to defeat summary judgment, i.e., his evidence was "merely colorable" at best and not "significantly

-11-

probative," *Revell v. Hoffman*, 309 F.3d 1228, 1232 (10th Cir. 2002) (quotation omitted) (applying summary judgment standard from *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

 The judgment of the district court is AFFIRMED.

       Entered for the Court


       Wade Brorby
       Senior Circuit Judge