Deborah McGLOTHIN, Plaintiff,

v.

The JACKSON MUNICIPAL SEPARATE SCHOOL DISTRICT, et al., Defendants.

Civ. A. No. J90–0402(L).

United States District Court, S.D. Mississippi, Jackson Division.

Nov. 30, 1992.

Deborah McGlothin, pro se.

Elizabeth L. Gilchrist, Jackson, MS, for plaintiff.

Pamela W. Dill, Brunini, Grantham, Grower & Hewes, Jackson, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

Plaintiff Deborah McGlothin was employed by the Jackson Municipal Separate School District (the District) as a teacher's aide from August 1983 until March 17, 1987, when the District discharged her for alleged insubordination, stemming from her willful failure to conform to the dress code of the school to which she was assigned. Following her termination, the plaintiff brought this action against the District [1] alleging that she was terminated because headwraps and hairstyles she wore as an expression of her sincerely held religious beliefs conflicted with the applicable dress code policy. Plaintiff alleged that because the District made no attempt to reasonably accommodate her religious be-

---

1. Plaintiff named as defendants The Jackson Municipal Separate School District (the District), Dr. Benjamin Canada, District Superintendent, The Board of Trustees of the District, and the Board's chairman, Dr. Ollye Shirley.

liefs, the termination of her employment violated her rights under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the First Amendment to the United States Constitution. As relief, she sought reinstatement, backpay, compensatory damages for mental anguish and emotional distress and attorney's fees and costs. The case was tried before the court sitting without a jury. Based on the evidence adduced and for the reasons that follow, the court finds and concludes that plaintiff has failed to establish her claims for relief.

The dispute between these parties arose as a result of plaintiff's wearing of head coverings in the classroom, more specifically berets and African-style headwraps, after being told by the principal of her school that this was not considered appropriate attire and was a violation of the school's dress code. Plaintiff claims that she wore these head coverings as an expression of her religious beliefs, yet defendants terminated her without making any effort to accommodate her beliefs. Defendants, on the other hand, maintain that plaintiff's beliefs were not, in fact, rooted in religion, and that even if they were legitimately rooted in religion, the plaintiff failed to so advise the District prior to her termination.

In order to sustain her claim under Title VII, plaintiff has the burden to demonstrate that (1) she had a bona fide religious belief that conflicted with an employment practice, (2) her employer had knowledge of her bona fide religious belief, and (3) some disciplinary action resulted from her failure to comply with the conflicting employment practice. *Turpen v. Missouri–Kansas–Texas Ry. Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984); *Brener v. Diagnostic Center Hospital*, 671 F.2d 141, 144 (5th Cir.1982). And to prevail on her First Amendment claim, she must prove that her beliefs regarding wearing head coverings or engaging in certain hair grooming practices were rooted in religion and sincerely held and that the District's enforcement of the school dress code had a coercive effect which operated to prevent her free exercise of those religious beliefs. *Thomas v. Review Board, Indiana*

*Emp. Security Div.*, 450 U.S. 707, 731, 101 S.Ct. 1425, 1440, 67 L.Ed.2d 624 (1981) (citing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

Ms. McGlothin described her religious beliefs in detail at trial, including the nature of her beliefs and the sources of those beliefs. She testified that she holds a deep spiritual belief that she must cover her head as a means of demonstrating spiritual and personal modesty and humility and to protect her spiritual self from disruptive influences or "negative vibes" from the outside. She cited as the source of her beliefs the spiritual teachings of many sources, including the Hebrew–Israelite faith, as well as verses from the Bible. She further testified as to her religious belief regarding the grooming of her hair. She explained that she did not comb or groom her hair using artificial means, but rather relied on finger combing, or intricate finger manipulation of the hair, and the use of herbs and natural oils for cleansing, because she believes that her hair should be allowed to "lock" as a source of spiritual strength and as a demonstration of the depth of her religious commitments. For these beliefs, she also cited teachings from the Hebrew–Israelite faith and Bible scriptures, as well as the teachings of Rastafarianism. Because the court finds that plaintiff failed to communicate to defendant that there was a religious basis for her conduct, the court concludes that she cannot sustain either the Title VII or First Amendment claim.

Plaintiff was first hired by the District as an assistant reading instructor in the fall of 1983. During her first year with the District, she worked at McLeod Elementary School, but beginning with the 1984–85 school year and continuing until the date of her termination in March 1987, she was assigned to Whitfield Elementary School.[2] According to the testimony of Kisiah Nolan, the school principal, during the fall of 1984, after the weather had turned cold, she noticed Ms. McGlothin wearing a red beret in the classroom. When Ms. Nolan told Ms. McGlothin that she needed to remove her cap when she

---

2. Whitfield Elementary School has since been renamed Pecan Park Elementary School.

entered the building, Ms. McGlothin explained that she needed something on her head since she was in a portable classroom and was constantly going in and out of the building. Ms. Nolan told her at that time that while there was nothing to prevent her from wearing the cap when she went outside, it was not considered appropriate classroom etiquette to wear a covering on her head in the classroom while working with the students. Ms. McGlothin did not immediately remove the beret, but she did begin coming to school without it. Later in the year, however, Ms. Nolan again noticed Ms. McGlothin wearing the beret in the classroom and reminded her of their earlier conversation in which she had informed Ms. McGlothin that she should not wear the beret in the classroom. Ms. McGlothin's responded to Ms. Nolan's remarks by asking that Ms. Nolan "put it in writing."

Following this conversation, according to Ms. Nolan, Ms. McGlothin stopped wearing the beret, but during Black History Month in February 1985, she began wearing African-style headwraps. This prompted Ms. Nolan to reiterate to Ms. McGlothin that she was not to wear head coverings in the classroom. Again, Ms. McGlothin responded that Ms. Nolan should "give it to [her] in writing."

The following fall, Ms. McGlothin resumed wearing a beret during the winter months and Ms. Nolan again told her that she did not consider it appropriate for Ms. McGlothin to wear a head covering in the classroom. Ms. McGlothin's response was the same: "Give it to me in writing." This conversation was repeated three or four times during that school year, as Ms. McGlothin would stop wearing the beret for a period of time but would then start wearing it again.[3] When Ms. McGlothin again donned headwraps during Black History Month in February of 1986, Ms. Nolan undertook to remind her that she did not expect head covering in the classroom. And after Black History Month ended, so did Ms. McGlothin's practice of wearing the wraps.

During the 1986–87 school year, Ms. McGlothin no longer wore the beret but, whereas she had in previous years worn her hair in a short, neatly trimmed afro, she started allowing her hair to grow and stopped combing it so that dreadlocks would form. She also stopped washing her hair so that over time, in Ms. Nolan's view, it began to appear "linty" and "matted." In mid-January, her hair had begun to "get really matted," which caused Ms. Nolan to consult with Dr. Joseph Pete, an Assistant Superintendent of the District, about the state of Ms. McGlothin's hair. Though Dr. Pete told Ms. Nolan that she needed to take command of the situation, she did nothing at that time.

During Black History month in the latter part of February 1987, Ms. McGlothin again resumed wearing headwraps, but was permitted to do so by Ms. Nolan, since Ms. McGlothin was actively involved in the celebration activities, and was in fact dressed in full African costume. However, when Ms. McGlothin continued to wear the wraps after Black History activities had ended, Ms. Nolan advised her that she needed to remove the wrap. At that time, Ms. Nolan expressed to Ms. McGlothin her concern about Ms. McGlothin's "alternating between an uncombed head and those headwraps," and insisted that the situation had to be rectified. Something had to be done. Ms. McGlothin responded that she had thought the wraps were acceptable in view of a multi-cultural educational directive which the District had adopted and presented to the teaching staff through an in-service program in January 1987. Ms. Nolan, however, advised her that it was not acceptable for her to wear the wraps and that it was still a violation of the school's dress code to wear head coverings in the classroom.

Ms. McGlothin did not stop wearing the headwraps altogether, but would do so on some days and not on others. And as the situation with her hair grooming had not improved, Ms. Nolan found her appearance unacceptable. Therefore, on March 6, 1987,

---

**3.** When asked why she did not, as Ms. McGlothin requested, put her complaint in writing, Ms. Nolan testified that she thought that she and Ms. McGlothin would be able to work the problem out without having to resort to formal documentation. According to Ms. Nolan, "when [she] begin[s] to document, than that's ... really of a serious nature."

the Friday preceding spring break, Ms. Nolan delivered to Ms. McGlothin a memorandum, advising that in spite of her several discussions with Ms. McGlothin over the years concerning what was considered appropriate professional dress, Ms. McGlothin had chosen not to conform to her expectations and had openly defied all of the directions given her concerning her head covering. Ms. Nolan stated:

> All children need positive role models, but especially do elementary aged children because of their very impressionable young minds. I am concerned that your appearance is giving them a distorted view of what is appropriate.

> Your current unit in health is entitled Keeping Healthy. One objective to be taught is how personal hygiene affects one's mental, social and physical health. I can't see how an effective lesson can be taught on good grooming, during this unit, when you are failing to comb your hair or you are wearing a head wrap in the classroom.

> During the spring break, I suggest that you take some time to make a decision as to whether you desire to remain at Whitfield Elementary School. **NO MORE OF YOUR INSUBORDINATION WILL BE TOLERATED.**

Upon receiving Ms. Nolan's memo, Ms. McGlothin went to see Dr. Pete, who was shown on the letter as having been provided a copy, to discuss the memo. According to Dr. Pete, Ms. McGlothin talked to him about the reasons for her wearing headwraps, those reasons relating to her Afro–American heritage. During the meeting, after reading the memo, Dr. Pete consulted the dress code for the school and found that it specifically proscribed the wearing of head coverings, providing that "head covering ... [is] not appropriate school attire for the classroom." He discussed that portion of the dress code with Ms. McGlothin, and ultimately told her that since her conduct did violate the dress code, she likely should try to work something

out with Ms. Nolan about the matter of her hair and dressing.[4]

On Monday, March 16, the first day following spring break, Dr. Pete contacted Ms. Nolan to determine whether Ms. McGlothin had decided to conform to the dress code and was told by Ms. Nolan that nothing had changed; Ms. McGlothin had returned to school wearing a headwrap. Dr. Pete thus communicated with Dr. Dan Merritt, then Deputy Superintendent for Instruction for the District,[5] to discuss with him concerns involving Ms. McGlothin and to request that a meeting be scheduled to address the situation. A meeting was scheduled for March 17, which Ms. Nolan and Ms. McGlothin were directed to attend. Dr. Merritt presided at the meeting, the purpose of which was to determine whether Ms. McGlothin's conduct was in violation of the dress code such that she was in a "state of insubordination." Dr. Merritt stated at trial that his intention in having the meeting on March 17 was to talk with Ms. McGlothin to find out why she would not conform to the dress code and to "really just talk to her about it at that time."

Dr. Merritt testified that although Ms. McGlothin had not offered any reason for her practices and had not mentioned religion, he asked her during that meeting whether her conduct had anything to do with her religion. He explained that he asked her this question because he knew enough about school law to know that was an area about which he had to be concerned and because he knew that if religion did happen to be a consideration, he could not have done anything at that time without seeking legal counsel. However, when Ms. McGlothin was asked whether religion was involved, she responded that it was not, and that her practices reflected her choice, her "personal preference to do this." Dr. Merritt explained to Ms. Nolan that she could be immediately discharged for insubordination, and offered her an opportunity to agree to remove the headwraps and remain employed. She refused, however, and Dr.

---

**4.** Though Ms. McGlothin claimed Dr. Pete offered her assistance, as is discussed *infra,* Dr. Pete specifically denied that he made any promises to Ms. McGlothin concerning her employment.

**5.** Dr. Merritt retired from employment with the District in July 1991.

Merritt therefore concluded that she was insubordinate and should be discharged.

Dr. Pete testified similarly that during the March 17 meeting, when Ms. McGlothin was asked why she wore the head coverings, she indicated that she preferred to wear them because of her Afro–American heritage. She gave no answer which indicated a religious reason for the practice, even after specifically being asked by Dr. Merritt whether the practice was part of her religion.

In contrast to the testimony offered by the District administrators responsible for her termination, Ms. McGlothin maintained in her testimony that she clearly advised each of them, Ms. Nolan, Dr. Pete and Dr. Merritt, that she wore head coverings and groomed her hair in a particular manner as a matter of religious expression. Ms. McGlothin stated that during her employment at Whitfield Elementary, she occasionally wore berets in the classroom during the winter months and that she wore African-style headwraps during Black History Month. Though she was initially unaware that Ms. Nolan found these head coverings objectionable, she later came to understand that Ms. Nolan did not consider head coverings in the classroom appropriate attire.[6] And according to Ms. McGlothin, when Ms. Nolan expressed her disapproval of Ms. McGlothin's wearing of head coverings in the classroom, Ms. McGlothin responded by explaining to Ms. Nolan that in wearing the wraps, she was practicing her religious beliefs. Ms. Nolan, though, did not change her position, and merely remarked, "Is there anything else about your religion I should know?"

Ms. McGlothin stated that while she chose, for religious reasons, to cover her head, she nevertheless, out of respect for Ms. Nolan and for the policies she was told were in place at Whitfield, discontinued wearing the headwraps when she learned that Ms. Nolan did not approve of them. In January 1987, the District presented a multi-cultural educational in-service program to inform the teaching staff about new multi-cultural policies adopted by the District, emphasizing the District's receptiveness to and acceptance of varied cultures, races and religions. According to Ms. McGlothin, this signaled to her an acceptance of her religious beliefs and practices, and consequently, after Black History Month, during which she wore African-style headwraps in connection with the activities of the celebration, she continued to wear the headwraps until Ms. Nolan voiced her objection to them.

Nothing further happened until March 6, when she received Ms. Nolan's memorandum criticizing her health and grooming practices and her failure to wear "appropriate professional attire." After she received that memo, Ms. McGlothin went to the District's central offices to see Dr. Joseph Pete, who was carbon copied on the memorandum. According to Ms. McGlothin, she expressed to Dr. Pete her concern for her job and her desire to continue working at Whitfield, and she further explained to Dr. Pete that she wore the head coverings as part of her religious beliefs. She expressed hope that he could remedy the situation and, according to Ms. McGlothin, Dr. Pete, who is also black, assured her that "in a situation like this, where it's concerning us as a race, he ha[d] concerns about it and he [would] work something out."

Because of her conversation with Dr. Pete, she felt better about the situation, so that following spring break, though she had heard nothing from Dr. Pete or Ms. Nolan concerning any ultimate resolution of the issue, she returned to school wearing a headwrap. Nothing happened that day, but the following

---

6. According to Ms. McGlothin, Ms. Nolan had made a comment about her wearing head coverings during her first year at the school, but at that time, she did not understand that Ms. Nolan found them objectionable. According to Ms. McGlothin's testimony, all Ms. Nolan had said to her during that first year when she wore headwraps was something to the effect of "What do you have under there?" Ms. McGlothin thought Ms. Nolan meant that jokingly, but came to understand the following year that Ms. Nolan opposed her wearing them when Ms. Nolan again brought up the subject of the wraps, asking Ms. McGlothin why she was wearing headwraps after Ms. Nolan had asked her earlier not to do so. It was then, according to Ms. McGlothin, that she realized that Ms. Nolan had meant that she did not approve of Ms. McGlothin's head coverings in the classroom.

day, March 17, she was told by Ms. Nolan that there was to be a meeting at the central office to discuss the issue. When Ms. McGlothin arrived at the central office, Dr. Pete and Dr. Merritt were there, as was Ms. Nolan. According to Ms. McGlothin's version of this meeting, Dr. Merritt opened the meeting by asking her whether she was familiar with Ms. Nolan's memo and the concerns stated in the memo, to which Ms. McGlothin responded by providing to each of those present a copy of a memorandum she had prepared in response to Ms. Nolan's March 6 memo. In her memorandum, Ms. McGlothin wrote:

> For the past three years you have harassed me, prevented me from practicing my cultural-religious and health beliefs, falsely accused me of insubordination, urged me to consider resigning, insulted me and inferred that I do not practice good hygiene, and stated that I do not provide a good example for the children.
>
> As a mother of four, struggling to provide for my children, without much financial assistance, I have lived in fear of losing this job if I practice my constitutionally guaranteed freedom to wear African head wraps and hair styles reflecting my religious beliefs. During the time that I was pregnant, you caused me much mental and physical duress, [sic] as a result I suffered a near nervous breakdown, at having to do duty in the rain and cold, without my head wrap, which I am accustomed to wearing.
>
> Interpreting Webster's definition of health and grooming, I "am" setting a good example for the children, since my hair is not harmfully altered from its natural state with destructive chemicals, irons and combs. Further, I practice the best of health teachings, which advocate using water, oils and herbs on the hair (and body), while manipulating it with means other than a comb. Your unnecessary, insulting remarks have brought me to tears on several occasions, and left me a psychological wreck in the recent past.
>
> Ms. Nolan, because you choose to "imitate" the dress style and hair characteristics of the majority race in this country, does not give you the right to try to force me to conform to racial and cultural practices foreign to my ancestry. According to the Multi-cultural Education Activity Booklet, equity and attitudes of teachers are paramount to ensure that children are educated to the rights of all races to co-exist in the class room environment.
>
> I pray that you will concentrate on the kind of dedicated, hardworking, loving and concerned teaching methods that I use to inspire the children under my care to learn and behave, and end this petty attitude to my right to be an example (that I am) of "our" African heritage.
>
> My present attempt to continue my practice of wearing traditional head wraps is not insubordination, but, in fact, it is in keeping with the Multi-cultural Educational directive we received recently, instructing us to provide these very examples you would deny me to be.

Ms. McGlothin stated that after each of those in attendance had the opportunity to read her memo, Dr. Merritt, without further discussion, simply announced that he had spoken with Dr. Pete and Ms. Nolan concerning her appearance, and they had recommended that she be dismissed. And he advised that for the reasons stated in Ms. Nolan's memo concerning her hair grooming, and her wearing of headwraps, and her insubordinate refusal to conform her practices as requested by Ms. Nolan, he agreed with their recommendation that she be terminated. Ms. McGlothin asked whether or not he had something in writing to that effect to give her and he said no; she was merely dismissed and should go home.

■ Considering the evidence presented regarding events transpiring prior to and at the time of her termination, the court is of the opinion that Ms. McGlothin did not communicate to the decision makers that her conduct was based on any religious beliefs. The proof demonstrated that until the spring of 1987 when she was terminated, Ms. McGlothin only wore head coverings either when the weather was cold or during Black History Month. She agreed in her testimony that wearing the berets in the winter was important because she had to go in and out of the portable classroom and wanted to stay

warm. And she acknowledged that her wearing of the headwraps during Black History Month was because the wraps were African in style and she wanted to exhibit to the students different things that were considered African.[7] While Ms. McGlothin denied that she was motivated to wear these head coverings solely by the cold weather or the fact of Black History Month and claimed instead that her religious beliefs were the primary reasons for her doing so, whether that was, in fact, the case, is not determinative. Rather, what is dispositive in the court's view is whether the District was aware of any religious motivations for her conduct.

Ms. McGlothin maintained in her testimony that in her discussions with Ms. Nolan during her years at Whitfield Elementary concerning her wearing of headwraps, she advised Ms. Nolan that this practice was part of her religious beliefs.[8] Ms. Nolan, however, testified credibly that Ms. McGlothin never gave her any indication that there was a religious reason for her wearing of head coverings.[9] She flatly denied that Ms. McGlothin, at any time prior to her termination ever conveyed to her that the wearing of the beret or the headwraps was an expression of any religious beliefs. The first inkling she had

that Ms. McGlothin claimed that these practices were religious in nature came only *after* the decision had been made to discharge her.

Dr. Pete similarly testified that at no time during his meeting with Ms. McGlothin on March 6, when she came to him to discuss Ms. Nolan's memo, or during the March 17 meeting at which she was terminated did she suggest that either her head coverings or her hair grooming was an expression of her religious beliefs. Dr. Pete was adamant in his testimony that at the meeting on March 6, Ms. McGlothin did not mention the word "religion" even once, and instead, spoke only about "her preference and practice and heritage." He stated he was certain that if she had indicated that this was a matter of "her religious situation," then, knowing the policies of the District, he would immediately have done something to either accommodate her or to have somehow dealt with the situation in a very different fashion. But he clearly recalled that she simply never mentioned religion. The only reasons she ever provided prior to her termination pertaining to her dress and grooming practices concerned her African heritage and culture.

Further, though Ms. McGlothin testified that she provided Ms. Nolan, Dr. Pete and

---

7. Ms. McGlothin suggested in her testimony that she did not know that the school's dress code prohibited the wearing of head coverings in the classroom. However, this position is belied by her own testimony that Ms. Nolan advised her that her wearing of head coverings in the classroom was against school policy.

8. Ms. McGlothin suggested that Ms. Nolan was familiar with her religious beliefs before she ever became employed at Whitfield, but the court finds nothing in the evidence to support that suggestion. She further claimed that the District was aware of her religious beliefs from the time she was hired in 1983. In this regard, she testified that when she was first hired by the District, she wore her hair "natural" and had partial covering of her hair. And she testified that while she was employed at McLeod Elementary, the principal of that school, Sally Davis, knew of her religious beliefs and even came to her on a couple of occasions when the school held special events to make sure that she did not offend Ms. McGlothin or her religious beliefs in any way. Ms. Davis testified, however, as did Glenda Smith, the teacher that Ms. McGlothin assisted while she was employed at McLeod, that she never observed Ms. McGlothin wearing a head

covering of any kind in the classroom or otherwise. Ms. Davis further specifically denied that she ever discussed Ms. McGlothin's religious beliefs with her, and testified, in fact, that she simply never discussed religion with Ms. McGlothin. The court found the testimony of both Ms. Davis and Ms. Smith credible, and hence discredits Ms. McGlothin's testimony on this point.

9. Ms. Nolan's testimony that the only response she received from Ms. McGlothin during the first two years when she expressed her disapproval of Ms. McGlothin's wearing of head coverings was "give it to me in writing." While the response described by Ms. Nolan seemed a rather odd response on Ms. McGlothin's part, Ms. McGlothin's testimony at trial indicated that she placed heavy reliance on the written word. Specifically in this regard, Ms. McGlothin testified that she did not actually believe she had been discharged on March 17 because nothing to that effect had been given her in writing, even though she asked Dr. Merritt whether there was something in writing to indicate that she was fired. Given Ms. McGlothin's testimony in this regard, Ms. Nolan's testimony about Ms. McGlothin's response to her warnings seems quite plausible.

Dr. Merritt, those present at the March 17 termination meeting, a copy of her March 13 memo to Ms. Nolan in which she cited the religious nature of her practices, each of those persons testified without equivocation and believably that they did not receive a copy of that memo until *after* Ms. McGlothin's employment was terminated. Ms. Nolan was first provided a copy during the Step 1 of the grievance process, in which Ms. McGlothin sought reconsideration of the discharge decision and reinstatement; and Drs. Pete and Merritt first became aware of the memo at Step 2 of the grievance process.

Having carefully and thoroughly considered all of the evidence presented, the court is persuaded that Ms. McGlothin simply did not communicate to Ms. Nolan, Dr. Pete or Dr. Merritt prior to her termination that she wore these head coverings or groomed her hair in a particular manner as religious expression. The court is further persuaded by the evidence that even during the grievance process following her termination, during which the topic of Ms. McGlothin's religion was indisputably discussed by District administrators with Ms. McGlothin, she never articulated a religious basis for her hair grooming and head covering practices. In this regard, the evidence showed that after the meeting on March 17 at which she was terminated, Ms. McGlothin immediately began to seek reinstatement, first filing a Step 1 grievance requesting that Ms. Nolan reconsider the termination decision, stating as the basis for her complaint that she had been fired for wearing African hair style and wraps. Ms. Nolan denied her request, stating that there had been "too much disharmony between Mrs. McGlothin and me for her to be reinstated at Whitfield Elementary School."

Following Ms. Nolan's denial of her Step 1 grievance, Ms. McGlothin proceeded to Step 2 of the District's grievance process, seeking review of Ms. Nolan's adverse decision. Ms. McGlothin stated on the grievance form that she had been "unfairly fired," and by way of explanation of her position, attached a copy

of her March 13 memo to Ms. Nolan. She filed the form, and sent a copy of her grievance, along with a letter she had composed to Dr. Fortenberry, appealing to him for reinstatement, stating:

> The reason for my dismissal is in direct conflict with the School's multicultural directive, in which the religious and cultural practices of the many races in the U.S. have been sanctioned by the Jackson Public School and resolved to be worthy of inclusion in the classroom.

> However, my insistence upon wearing traditional African head wraps and hair styles have [sic] been viewed as insubordination. I would like to meet with you to discuss whether or not your policy allows any other recourse such as placing me at another school that does not share this cultural bias.

A grievance hearing was held on April 1 before a committee comprised of John McCarty, Acting Assistant Superintendent for Personnel Services,[10] who chaired the hearing, Dr. Pete and Dr. Mary Jackson. Both Ms. McGlothin and Ms. Nolan attended the meeting.

Ms. McGlothin testified that at the April 1 hearing, she was asked what had happened, and she let the committee members know that she wanted to wear headwraps in the classroom because of her religious beliefs but had been told that she would not be allowed to do so. According to Ms. McGlothin, Ms. Nolan, who was allowed to tell how she felt about the headwraps, expressed concern that the wraps were not African because these teachings she described were widely practiced in the Caribbean islands. Ms. McGlothin, however, assured her that the teachings which she was following were very much African. During the hearing, Dr. Pete and Mary Jackson were allowed to ask her questions, and Ms. McGlothin recalled in particular Mary Jackson asking her to explain "some of the things about my religion."

After the hearing, the committee upheld the termination decision, and so advised Ms. McGlothin by letter dated April 7, 1987. Ms.

---

**10.** In that capacity, Dr. McCarty was responsible for overseeing personnel policies and practices, including the conduct of grievance procedures. Dr. McCarty retired from employment with the District in July 1992.

McGlothin proceeded to Step 3 of the grievance process, in which she appealed the grievance committee's decision to Dr. Robert Fortenberry, then Superintendent of the District. Dr. Fortenberry supported the recommendations and findings of the committee, so in a final attempt to secure reinstatement to a position within the District, Ms. McGlothin wrote to the Board of Trustees of the School District, stating that she thought the decisions of the grievance committee and Dr. Fortenberry were in error and unfair, and further stating:

> In addition, I believe the headwraps, hairstyle and clothing that I wear are an essential part of my cultural, ethnic and religious views. As such, they are protected by the United States Constitution.

Her letter to the Board of Trustees resulted in another meeting on May 12, 1987. Present at the meeting were Dr. Merritt, Dr. Pete, Dr. McCarty and Dr. George Terry, Director of Classified Personnel Services. According to Ms. McGlothin's testimony, in response to a question by Dr. Merritt concerning why she wore the headwraps, she explained again that it was for religious reasons. Dr. Merritt asked her for the name of her religion, and when she responded that "it was the original Hebrew Israelites from Ethiopia," Dr. Merritt told Dr. Terry to write that name down. At that point, the meeting ended with Dr. Merritt saying, "well, you know, prior we didn't realize that it was for religious reasons and now that we do, that's a different story; and we have it all recorded." But in response to Ms. McGlothin's inquiry, he said that there was "no change" in the termination decision; that he merely wanted to know the name of the religion. This committee upheld the dismissal decision, advising Ms. McGlothin by letter:

> Statements given by you during the meeting affirmed that your religion does not require your wearing a head dress. Instead, you stated that your choosing to wear the head dress was something that was embedded in you from your practices

of the original Hebrew–Israelite cultural heritage.

The committee "continue[d] to find [her] practice of wearing headcovering ... objectionable," and not in compliance with "customary and reasonable standards for personal appearance." Therefore, she was told that if she would comply with the District's requirement that she remove the head covering during working hours, every reasonable effort would be made to offer her employment in the district. Ms. McGlothin, however, testified that as the wearing of the headwraps was too deeply embedded in her religious beliefs for her to part with those beliefs, she did not accept the offer and communicated that decision to the District.

In contrast to Ms. McGlothin's testimony, administrators of the District who attended and participated in the April 1 grievance meeting and the later May 12 "exit" meeting, testified that while she mentioned religion and was questioned concerning religion, every explanation Ms. McGlothin provided for her wearing of head coverings and for her hair grooming practices was cultural in nature. John McCarty testified that accompanying Ms. McGlothin's Step 2 grievance complaint, in which she claimed that she had been "unfairly fired" and sought reinstatement, was a copy of her memorandum to Ms. Nolan. A grievance committee, comprised of Dr. McCarty, acting as chairman, Dr. Pete, Dr. Mary Jackson and Dr. George Terry,[11] was convened and a meeting was held with Ms. McGlothin and Ms. Nolan on April 1 to examine the facts pertaining to Ms. McGlothin's termination and to investigate the concerns which she had listed in her memo to Ms. Nolan. According to Dr. McCarty, when in the course of that meeting Ms. McGlothin was called upon to explain why she believed her dismissal was unfair, she stated that it was unfair because she had been dismissed for reasons that did not allow her to practice her cultural, religious and health beliefs. But when she was asked to explain what she meant by "cultural, religious and health beliefs," Ms. McGlothin responded with an explanation which "centered around the fact

---

**11.** Dr. McCarty testified that Dr. Pete and Dr. Terry were of African American heritage, and that Dr. Jackson was selected for the committee because she was female, and also of African American heritage.

that she needed to wear the head covering to keep from getting cold, [and] that she was of Afro–American heritage, and it was cultural for her to wear this. It was her cultural heritage," and she was practicing and implementing the District's policy of encouraging multi-culturalism. When Ms. McGlothin was further pressed to explain what she meant by "cultural and religious beliefs," she replied that "it was her way of life." All of her statements pertained to her "religion as a way of life" and her "way of life in practicing religion." Yet all of the explanations she offered pertained to culture, rather than religion. Dr. McCarty testified that in her answers to the questions posed about the reasons for her wearing the head covering, Ms. McGlothin said nothing to indicate that this practice was an expression of any religious beliefs and, in fact, she made no explanation that dealt with religion; rather, according to Dr. McCarty, her answers "all dealt with culture." The same was true with respect to her explanations concerning her hair grooming practices; she stated that her grooming practices were consistent with the Afro–American heritage and culture, but she made no reference to it as being a religious practice. Instead, "it was all general and cultural in background."

Dr. Pete similarly testified that the April 1, 1987 hearing was held to determine whether Ms. McGlothin's discharge had been proper, and in particular, was undertaken, in light of Ms. McGlothin's memo, to determine whether or not the matter of religion was involved in her dismissal, since her memo referred to "my cultural, religious and health beliefs, and to practices "reflecting my religious beliefs." According to Dr. Pete, though, when asked about these matters at the hearing, Ms. McGlothin merely restated information regarding her African heritage, and expressed that her practices regarding her hair grooming and head coverings were a matter of "preference." Questions were posed to her by committee members concerning her religion and her reasons for wearing headwraps,

and Ms. McGlothin consistently responded that it was part of her Afro–American heritage and was her preference. And, though he had limited specific recollection of the content of the discussion at that meeting, Dr. Pete testified that nothing Ms. McGlothin said in the hearing indicated to him that her wearing of head coverings or the grooming of her hair was reflective of any religious beliefs she held.

Dr. Merritt testified that a second meeting was held with Ms. McGlothin on May 12, 1987 concerning Ms. McGlothin's termination at the instance of the superintendent, Dr. Fortenberry, after Ms. McGlothin wrote a letter to the Board of Trustees expressing dissatisfaction with the grievance committee's decision.[12] The meeting was attended by Dr. Merritt, Dr. Pete, Dr. McCarty and Ms. McGlothin and the topic, again, was the reason for her wearing head coverings. Based on the explanations she provided, it was concluded at that meeting that Ms. McGlothin did not have any religious beliefs underlying her wearing of the headwraps or her hair grooming practices and the discharge decision was upheld.

Dr. Merritt testified that at the May 12 meeting, he again asked Ms. McGlothin questions concerning the reasons why she wore the head covering, and that he asked her specifically, "Is it part of your religion to wear the head band?" She said no, that it was her preference, "her personal preference." And when she indicated that it was part of the Hebrew–Israelite cultural heritage, he asked was it required by that cultural heritage, and she said no. In short, according to Dr. Merritt, she never suggested that the head coverings or her hair grooming were an expression of any religious belief. Rather, they were expressions of a cultural heritage and her personal preference.

Dr. McCarty testified regarding the May 12 meeting that Dr. Merritt asked Ms. McGlothin if the wearing of the head covering was specifically required by her religious

---

**12.** Dr. Merritt testified that Dr. Fortenberry told him that the School Board had received a letter from Ms. McGlothin in which she said that religious beliefs were the reason for her wearing the headwraps. According to Dr. Merritt, he told Dr. Fortenberry that he had not gotten that out of their previous meeting, nor had the grievance committee understood that to be the case, but that he would nevertheless be happy to go back and talk to Ms. McGlothin again.

practices, to which she responded no. And according to Dr. McCarty, when she was asked why she wore the head covering, her response was, again, as it had been before, that "[i]t was her culture; [i]t was her way of life." And though she stated that it referred back to the Hebrew–Israelite culture, she said nothing to suggest that the head coverings or her hair grooming were the expression of any religious beliefs. Dr. Pete, who was present at the meeting of May 12, also testified that the reasons offered by Ms. McGlothin for her wearing head covering and for her hair grooming practices related to her preference and her Afro–American heritage, and again, she said nothing to suggest to him that these practices were an expression of any religious belief.

The court is persuaded by the evidence that the District was unaware, at the time of her termination or at any time during the grievance process, that Ms. McGlothin's hair grooming and head covering practices were religious in nature. The Step 2 grievance committee had before it the testimony of Ms. Nolan that during the three years Ms. McGlothin was employed at Whitfield Elementary, Ms. McGlothin never informed Ms. Nolan that her wearing of head covering was the expression of any religious belief. Further, the fact that Ms. McGlothin did not consistently wear head coverings, but throughout those years, did so only when it was cold and during Black History Month, tended to suggest that she wore them for reasons other than religion, i.e., physical comfort and cultural expression.[13] And even when in the spring of 1987 she continued to wear the wraps past Black History Month, the only explanation she provided for her doing so was that she thought that she could do so in light of the multi-*cultural* directive of the district.

The grievance committee was not required to merely accept, without question or inquiry, Ms. McGlothin's characterization of her conduct as "religious," and was instead entitled to explore the basis for Ms. McGlothin's claim that it was religious expression. That is, the mere fact that Ms. McGlothin labelled her conduct "religious" did not have to be accepted as dispositive on the question of whether that was in fact the case. In this vein, Dr. McCarty testified that the Step 2 grievance committee was very sensitive to the possibility that Ms. McGlothin's practices might be related to religion in view of Ms. McGlothin's references in her March 13 memorandum to religion. Indeed, each of those involved in the grievance process and the "exit" meeting appears to have been legitimately interested in determining whether Ms. McGlothin's reasons for engaging in these practices were religious,[14] and each was alerted to the possibility of a religious basis for the practices by Ms. McGlothin's memo. These witnesses all agreed that Ms. McGlothin's memo gave them cause to explore her claim that her practices were religiously motivated, but none considered that the explanations provided either in the memo, or in their subsequent discussions with Ms. McGlothin about her memo and her beliefs, indicated that her practices were religious in nature. Rather, the reasons she consistently provided had to do with cultural considerations. She did speak of religion as "a way of life," but the way of life she described was, to their understanding, nothing more than expression of her African heritage. Dr. McCarty stated, and his testimony was echoed by Dr. Pete and Dr. Merritt, that even though Ms. McGlothin's memorandum made reference to religious beliefs, she did not "talk about" any such beliefs in the memo but instead spoke in terms of cultural reasons for her practices and her personal preferences.[15] And further, when she was asked

---

**13.** Further, her lack of consistency in wearing head coverings could be viewed as indicating that her professed beliefs were not "sincerely held."

**14.** For this reason, among others, the court does not credit Ms. McGlothin's testimony that she was terminated without any discussion about the reasons for her practices, or her testimony that Dr. Merritt told her at the May 12 meeting that

all he wanted to know was the name of her religion.

**15.** Ms. McGlothin undertook to explain in her testimony what she meant when she used such phrases as "cultural, ethnic and religious views" in her memo and to the District's administrators:

I mean that what you see, my external appearance, the culture is what you see. But it's

in the various meetings to explain how the practices were religious, other than speaking in terms of her religion being a way of life, her explanations related to culture and her cultural heritage.[16]

The court is persuaded, having heard her testimony, that at this time, Ms. McGlothin's beliefs pertaining to head covering and hair grooming are sincerely held and the court is likewise persuaded that Ms. McGlothin views these beliefs as being "religious."[17] However, the court is unable to conclude that Ms. McGlothin communicated the religious nature of these beliefs to defendants. The explanations which the District's witnesses credibly maintain she provided did not, in the court's opinion, indicate that her practices were based on religious beliefs. Rather, they were reflective of the African culture and Ms. McGlothin's African heritage.[18] Culture, in the sense explained by Ms. McGlothin at and following her termination, does not in the court's opinion equate with religion.[19] Ms. McGlothin herself testified that her beliefs have "intensified" over

---

based on my race and the culture of my race and that my religious views are that these things reflect my religious views, the way I dress and who I am is a reflection of the religious and spiritual beliefs which I practice.

As this testimony reflects, even while Ms. McGlothin referred to "religious views" and "spiritual beliefs," in her explanation to the court, she described her "religious views" as reflecting her "race and the culture of [her] race."

Further, she indicated at trial that while she may have described her practices as being a personal choice or preference, she meant that it was a preference only in the sense that she preferred to act in accordance with her spiritual beliefs:

I believe that is a syntax in the language and how we communicate in terms of something being a preference. I prefer not to be without spiritual belief that does not adhere to these practices. It's not something that I just created out of the blue. It's something that had been long coming in my spirituality within me. So it's not like I just do or don't or don't care, like it's something that's just flying off the bat or something like that in terms of preference. It's a lifestyle that I dedicated myself to or spiritual lifestyle that adheres to these type practices and recognizes these practices as being something spiritual.

There is no proof, however, that she provided any such explanation either before her termination or in the grievance process following her termination.

16. Ms. McGlothin testified at trial that her religious beliefs stem from the beliefs of the original Hebrew–Israelites of Ethiopia, and that she explained that to the various administrators during the grievance process. However, the court finds that regardless of what she may have intended to say, Ms. McGlothin's reference was to the Hebrew–Israelite *cultural heritage* and not to a Hebrew–Israelite *religion*.

17. Even after having heard her testimony, the court is uncertain whether her beliefs are legitimately rooted in religion. And the court has some question as to whether the beliefs described by Ms. McGlothin in her testimony before this

court were sincerely held *at or before the time* she was terminated or whether they have evolved over time.

18. Plaintiff suggests that she was not required to articulate her religious beliefs in such a way that the District administrators fully understood them. While certainly, these administrators need not have had a complete appreciation of the intricacies of her religion, she was required to articulate her beliefs in such a way that they might come to appreciate that the beliefs were at least religious in nature. This, in the court's opinion, she did not do.

19. The Supreme Court has not defined precisely what constitutes a religious belief in free exercise cases. It is clear that a religious belief, to be entitled to protection, need not recognize a supreme being, *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); nor must it arise from a traditional, or even an organized religion, *Frazee v. Illinois Department of Employment Security*, 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989). However, it is not sufficient that the proffered belief is one's personal preference; rather, it must "ha[ve] an institutional quality about it," concern a comprehensive religious theory, and be sincere. *Brown v. Pena*, 441 F.Supp. 1382, 1385 (S.D.Fla.1977), aff'd, 589 F.2d 1113 (5th Cir.1979) (citing *Brown v. Dade Christian Schools, Inc.*, 556 F.2d 310, 324 (5th Cir.1977)). In *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15 (1972), the Supreme Court explained:

A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religion. Although a determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. . . .

time, or since the time of her discharge. It is perhaps the case that the passage of time has brought to her a deeper understanding of the nature and source of the specific beliefs which are at issue and that her present understanding and the present strength of her beliefs have in turn facilitated her ability to articulate the origin and role of those beliefs in her life. Nevertheless, what is relevant is what she imparted to the District at or about the time of her termination from employment. Because the court concludes that the District was not informed at that time that her practices were of a religious nature, it follows that plaintiff cannot prevail on her claims in this case. The District is required, under the First Amendment and Title VII, to make some accommodation for the practice of religious beliefs when it pursues an end which incidentally burdens religious practices. However, the District cannot be found liable for failing to accommodate Ms. McGlothin's proffered "religious" beliefs when the District was unaware that her beliefs were religious such that there was a need for accommodation.

Based on the foregoing, the court concludes that plaintiff has failed to sustain her claims and that her complaint must therefore be dismissed with prejudice.

Accordingly, it is ordered that plaintiff's complaint is dismissed with prejudice. A separate judgment will be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure.

ORDERED.