In re Beatrice L. BELCHER, Debtor.

Beatrice L. Belcher, Plaintiff,

v.

Columbia University; AFSA Data Corp.; Society National Bank; Ameritrust Company National Ass'n; Massachusetts Higher Education Assistance Corp. d/b/a American Student Assistance; Elsi/Law Access; Graduate Loan Center; The Educational Resources Institute; and the United States Department of Education, Defendants.

Bankruptcy No. A–99–72764–SWC. Adversary No. 99–6566.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Jan. 23, 2001.

Beatrice Belcher, Atlanta, GA, pro se.

Paul J. Morochnik, Ron C. Bingham, II, Thompson, O'Brien, Kemp & Nasuti PC, Norcross, GA, for The Educational Resources Institute.

Thomas W. Joyce, Jones, Cork & Miller, Macon, GA, for Educational Credit Management Corp.

Shayna M. Steinfeld, Steinfeld & Steinfeld, Atlanta, GA, for Pennsylvania Higher Education Assistance.

## ORDER

STACEY W. COTTON, Chief Judge.

On November 15, 2000, a trial was held on Plaintiff's complaint to determine

whether her student loans were dischargeable based upon an undue hardship. 11 U.S.C. § 523(a)(8). Present were the *pro se* Plaintiff Beatrice Belcher ("Belcher"), who is the Debtor in this case and a member of the State Bar of New York, counsel for creditor Educational Credit Management Corporation ("ECMC"), and counsel for creditor The Educational Resources Institute ("TERI"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Upon consideration of the evidence and arguments of counsel, the court's finding of facts and conclusions are set forth hereinafter.

## FACTS

Plaintiff filed her Chapter 7 bankruptcy case on August 31, 1999. Her Statement of Affairs shows that she earned in excess of $32,000 in 1997, $38,000 in 1998, and $10,000 from January 1, 1999 to August 29, 1999. She scheduled in excess of $81,000 in student loans and in excess of $23,000 in credit card debt. Her monthly student loan payments were $1,100 and monthly credit card payments were in excess of $500 per month. At the time of filing her petition, she listed herself as unemployed, with no monthly wages, and exemptions of $3,105, including a retirement account of $1,750.

### 1. Defendants

Originally, Plaintiff named nine Defendants in her complaint. Defendants Society National Bank and Ameritrust Company National Association had previously assigned their loans in question to ECMC. Defendant Massachusetts Higher Education transferred its interest to ECMC on January 2, 2000. On January 31, 2000, Plaintiff and Defendant United States Department of Education entered into a stipulation to dismiss this defendant without prejudice. On November 1, 2000, Plaintiff and Defendant Graduate Loan Center/Pennsylvania Higher Education Assistance Agency entered into a joint dismissal, based on there being no debt owed to this Defendant.

There were three defendants that did not answer or otherwise respond: Defendants AFSA Data Corporation, ELSI/Law Access, and Columbia University. Both AFSA Data Corporation and ELSI/Law Access are listed on Plaintiff's schedules as loan servicers. Plaintiff testified at trial that she has student loans with Columbia University which include Perkins loans that she believes are still held by Columbia University (Trial Transcript 11/13/00, hereinafter "Trial Trans," at 4). She noted that Columbia had not answered her complaint. (Trial Trans, at 21). Plaintiff's Exhibits 4,5,8, and 9 which evidence Statements of Accounts from Columbia and Exhibits 6, 7, 10, and 41–74 which are canceled checks from Plaintiff to Columbia U–Crown Loan and Columbia U-NDSL/Perkins were admitted into evidence without dispute. No other evidence of the remaining outstanding balance was presented with regard to the Columbia University student loans.

With respect to Defendant ECMC, the parties stipulated in the pre-trial order that there was an outstanding balance of $49,734.25 as of May 3, 2000. With respect to Defendant TERI, the parties stipulated in the pre-trial order that Debtor had executed a Consolidation Loan Promissory Note for $14,017.04, payable to Key Bank USA, N.A., which was subsequently assigned to TERI, and as of August 22, 2000 the total balance, with interest, was $15,417.78.

### 2. Testimony At Trial

At trial, Plaintiff was the only witness called to testify. She stated that she had graduated with a business major from Ohio State University, that she scored in the 96th percentile on the LSAT, that she

received numerous acceptances to prestigious law schools, and chose Columbia University. She passed the New York Bar exam in 1995 after graduating and continues to maintain her New York license to practice law in active status. In 1998, she left her first job with South Brooklyn Legal Services for a position with PRAD Area Community Counsel, which was a non-profit company, at an annual salary of $45,000. While working for PRAD, she met the Robinson family. She was first interested in them because of their diet of raw fruits, vegetables, seeds, nuts and grains. As she learned more, she was attracted to their concept of community. She found she shared with them a whole value and belief system, including diet, the use of natural products, clothes, medication, forms of recreation, and rearing and educating children. Plaintiff voluntarily left her PRAD job of only four months and moved to Atlanta with the Robinsons.

Plaintiff first began to look for work in Atlanta as an attorney in the private sector, with the hope that she would bring in more money to help support the Robinson family and herself. When she didn't get any offers there, she began to target government and public service employers. She testified, however, that the process of interviewing became more uncomfortable for her as she realized that she did not want to spend so much of her time with people who did not share her value system.

In addition, she had become pregnant and realized that she would have only a few months to work before quitting when her child was born. After her child was born, Plaintiff received an offer from the City of Atlanta Solicitor's office, in February or March 2000, for a law clerk position for an annual salary in excess of $30,000. She rejected the offer because she does not desire to work at all outside of the community. She did find paralegal, secretarial, and data entry work, all on a temporary basis, until the day her daughter was born. The many letters Plaintiff wrote or received with respect to her attempts to find work were admitted into evidence.

Plaintiff also testified that she was one of the founders of the community, and in June, 2000, she incorporated the community as the Kwatamani Family Community, a non-profit corporation. She also filed an application for tax exempt status for the Kwatamani Family Community which is pending. The Certificate of Incorporation of the Kwatamani Family Community and its ByLaws were admitted into evidence. (Plaintiff's Exhibits 166 and 167). She explained that an individual who enters the community gives up all property to the community as individual ownership is not permitted, and, upon leaving the community, an individual would not be entitled to any assets. The community provides food, clothing, shelter, and other necessities for its members. Plaintiff stated that she did not have much to give the community in the way of possessions, other than the exemptions listed in her bankruptcy case and her debts. She also testified that she devoted all her energies to working for the community, that the community travels throughout the country promoting their raw food diet and messages of holistic living through CDs, books, and seminars. Plaintiff intends to permanently remain a member of the community and has no independent income to pay her student loans.

Plaintiff testified that she was required to begin repaying her student loans to Columbia immediately after graduation. The other loans she was able to defer paying until she began working. During the almost one and a half years it took to find an attorney position, she worked as a temp doing mostly paralegal work so that

she could make monthly loan payments. She has paid some $36,000 on her student loans. Her bankruptcy case was filed because she was being harassed by creditors calling her at all hours, and not to get out of paying her student loans.

Additionally, Plaintiff testified that both she and her daughter are in good health; that she has never attempted to procure child support from the father of her child since as a member of the community the child's needs are taken care of; that her drastic lifestyle change was purely voluntary; that she has no plans for taking a job outside of the community; that formerly one of the adults living in the community worked outside of the community as a media specialist and librarian; that Mr. Robinson had worked for Emory University in 1999 with youth who had behavioral problems; that she has not applied to take the Georgia Bar exam as the community did not approve the decision or the expense to take it; that she had received tax refunds for 1999 of approximately $4,467; and, that she has discharged all her credit card debt.

## DISCUSSION

■ Plaintiff seeks to discharge her student loans under the hardship provision in 11 U.S.C. § 523(a)(8).[1] Debtor contends that she devotes all her time and energy to the Kwatamani Family Community, Inc., a non-profit corporation and apostolic community, but receives no income for the work she does. Debtor contends that her situation meets the *Brunner* test, which has established the standard for an "undue hardship" discharge. *Brunner v. New York State Higher Education Services Corp.*, 46 B.R. 752 (S.D.N.Y.1985), *aff'd*, 831 F.2d 395 (2nd Cir.1987); *In re Roberson*, 999 F.2d 1132 (7th Cir.1993)(adopting the *Brunner* test); *Pennsylvania Higher Education Assistance Agency v. Faish*, 72 F.3d 298 (3rd Cir.1995)(adopting the *Brunner* test), *cert. denied*, 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996). This court agrees that *Brunner* sets forth the appropriate test for determining "undue hardship" cases under 11 U.S.C. § 523(a)(8).[2] *Brunner* enunciates a three part test: (1) that the debtor cannot maintain a "minimal" standard of living based on current income and expenses if forced to repay the student loans; (2) that the circumstances that prevent the debtor from repaying the loan will persist for a significant portion of the repayment period; and, (3) that the debtor has made good faith efforts to repay the loans.

Debtor contends that since she earns no income, she cannot meet a minimal standard of living for herself and her daughter if she is forced to repay her student loans; since she intends to remain within the community permanently, the inability to pay her student loan debt will persist for a significant portion of time; and, having already repaid $36,000 of her student loan debt, she has made a good faith effort to

---

1. 11 U.S.C. § 523
    (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
    (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

2. The court recognizes that two other tests have been applied, the *Johnson* test, and the *Bryant* test. *In re Johnson*, 5 Bankr.Ct. Dec. 532 (Bankr.E.D.Pa.1979); *In re Bryant*, 72 B.R. 913 (Bankr.E.D.Pa.1987). Neither is as persuasive as *Brunner*.

repay her loans. She further argues that a denial of her student loan discharge would violate the free exercise clause of the First Amendment by forcing her to choose between freely exercising her personal religious beliefs or repaying her student loans. Additionally, Plaintiff argues that denial of the undue hardship exception would violate her right to freedom of association and freedom to direct the education and upbringing of her daughter.

Debtor relies on several cases to support her position, particularly on *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)(state statute abridged right to free exercise of religion in violation of the First Amendment by disqualifying appellant for unemployment compensation solely because of her refusal to work on Saturday contrary to her religious belief); *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)(state's denial of unemployment compensation benefits to Jehovah's Witness, who terminated his employment because his religious beliefs forbade participation in production of armaments, violated his First Amendment right to free exercise of religion); *Hobbie v. Unemployment Appeals Commission of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987)(state's refusal to award unemployment compensation benefits violated free exercise clause of First Amendment where claimant was discharged because she refused to work on her Sabbath); *Frazee v. Illinois Department of Employment Security*, 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989)(state's denial of unemployment benefits to worker who refused position because job required him to work on Sunday contrary to his religious beliefs violated free exercise clause of First Amendment despite his not being part of an established religious sect).

Defendants ECMC and TERI argue that Plaintiff did not meet the criteria for "undue hardship" because her choice, unlike those who have been permitted to discharge their student loan debt, was purely voluntary. She has freely chosen to divest herself of her property and not to seek gainful employment. Her decision to remain a member of the community for a significant portion of the repayment period is also completely within her control. Further, her dependent would be entitled to financial support from the father if Plaintiff chose to seek it. Plaintiff could certainly find legal work if she chose, at a salary that would support her payment of her student loans. She rejected a job in the city solicitor's office, earning in excess of $30,000 and continues to affirm that she would not look for a job outside of the community. Defendants argue that unlike many debtors who receive a discharge of their student loans, neither Plaintiff nor her dependent are suffering from some physical or mental impairment. Additionally, Defendants object to the introduction of the constitutional claims because they were injected either after the close of discovery or raised only at trial.

### (A) Application of Brunner Test

██ *Brunner* recognizes that congress "intended to make the discharge of student loans more difficult than that of other nonexcepted debt." *Brunner*, at 396. *See also O'Flaherty v. Nellie Mae, Inc.*, 204 B.R. 793, 797 (Bankr.N.D.Ala.1997)(Congress, courts of appeals, and bankruptcy courts recognize a heightened standard of dischargeability for student loans). The *Faish* court, in adopting *Brunner*, found that "[s]tudent-loan debtors have the burden of establishing each element of the *Brunner* test. All three elements must be satisfied individually before a discharge can be granted. If one of the requirements of the *Brunner* test is not met, the

bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Faish,* at 306.

■ Plaintiff does not contend that she cannot obtain employment sufficient to support herself, her dependent, and pay her student loans. Rather, her position, that she comes within the *Brunner* test, begins with her assertion that she earns no income, because of her choice of this communal lifestyle. Therefore, she contends she cannot maintain a minimal standard of living if forced to repay her student loans. In cases relied on by Plaintiff, the courts reviewed the debtors' incomes and expenses, usually in some detail, in making the determination of dischargeability. In those decisions allowing the discharge of student loans, the hardship and difficulty faced by debtors in providing food, clothing, and shelter for themselves and their dependents is glaring. Generally, those debtors' hardships are due to circumstances beyond their control. Usually, such debtors are unable to meet even a minimal standard of living before factoring in payment of their student loans. *Cheesman v. Tennessee Student Assistance Corporation,* 25 F.3d 356 (6th Cir.1994); *Harris v. Unipac Service Corp.,* 198 B.R. 190 (Bankr.W.D.Va.1996); *Derby v. Student Loan Services,* 199 B.R. 328 (Bankr.W.D.Pa.1996); *Queen v. Pennsylvania Higher Education Assistance Agency,* 198 B.R. 116 (Bankr.E.D.Pa.1996); *Skaggs v. Great Lakes Higher Education Corp.,* 196 B.R. 865 (Bankr.W.D.Okla.1996). In these cases the debtor is either working very hard to make ends meet and/or there is an illness or injury of the debtor or a family member which compromises the ability to provide a "minimal" standard of living.

Such is not the case with Ms. Belcher. She and her daughter are healthy and are not going without food, clothing, or shelter because they are provided by the Kwata-mani Family Community. Ms. Belcher argues that she and the community, like the debtors who succeed in having their student loans discharged, live a very frugal life:

In the community that I'm in now the children in the community including my daughter, we don't use television, we don't go out. Like, for entertainment we don't watch movies, go out dancing, go out to eat. We eat the food that we make ourselves. It goes down to the clothing that we wear.

Again, we don't wear things that are made from animals, even down to things that most people take for granted like the shampoo that you use for your hair. We just use lime because anything that we put on our body, it's going to go back in there. So it goes to not only what we put in our body but what we put on our ·bodies.

So all of these things are now principles that I live by. Another thing that happened when I came—I got pregnant in April and now my daughter is nine months old, but part of that lifestyle choice was that the birth was at home, you don't deal with hospitals, any kind of drugs or medication, even including vitamin supplements. So she was delivered at home with the other sisters in the community basically there and delivering her. And now, I don't want her exposed to any of those things that I talked about previously.

The other thing is that the best nutrition for her is breast milk, so I breast-feed her, and I've done that since she was born. I'll continue to do that until she's two years old. So that makes working in any kind of setting outside of the community setting almost impossible because I can't carry her to work and just breast-feed her. We don't squeeze

it out in a pump and put it in a bottle. It comes straight from nature.

(Trial Trans, at 10–12).

The frugality in which the debtor lives is self-imposed. The community is able to spend funds to travel to introduce their holistic community to others, according to Ms. Belcher. She joins the community in this travel along with her daughter. Additionally, the community sells its food, books, and CDs. Presumably, the money the community receives in exchange for these material things and its seminars are used to provide its members with food, clothing, shelter, and other necessities. The community receives income, and its long range plan is to purchase land "so that we can farm our own food, make our own clothes, and set up a place where people can come so that they can get healing through their way of eating." (Trial Trans, at 20). The community also receives all possessions from those who join it. Ms. Belcher's possessions included her computer, and presumably her 1999 income tax refund of $4,467, and her IRA.[3]

While Ms. Belcher testified she would have no income to repay her student loan debt, this is inconsistent with the application for the Kwatamani Family Community seeking approval as a tax exempt organization under 26 U.S.C. § 501(d). This section of the Internal Revenue Code provides the following exemption from taxation:

(d) **Religious and apostolic organizations.**—The following organizations are referred to in subsection (a): Religious or apostolic associations or corporations, if such associations or corporations have a common treasury or community treasury, even if such associations or corporations engage in business for the common benefit of the members, but only if the members thereof include (at the time of filing their returns) in their gross income their entire *pro rata* shares, whether distributed or not, of the taxable income of the association or corporation for such year. **Any amount so included in the gross income of a member shall be treated as a dividend received** [emphasis added].

When Ms. Belcher drafted Article 8, Section 2 of the By–Laws of the Kwatamani Family Community, she included a provision that closely tracks the language of § 501(d):

Article 8, Section 2, ¶ 2; Each member of the corporation has a definite, though undivided, interest in the community treasury and property of the corporation. The business of the corporation is conducted for the common benefit of all of the members. Each member of the organization must include in his or her gross income (at the time of filing his or her individual income tax return) his or her *pro rata* share, whether distributed or not, of the net income of the corporation for the taxable year of the corporation ending with or during his or her taxable year. Any amount so included in the gross income of a member shall be treated as a dividend received.[4]

---

3. The court recognizes that Ms. Belcher could not have simply "transferred" her IRA to the community since the IRS does not permit such a transfer. She could have cashed it in, which would have caused her to incur a penalty charge, and have given the remaining amount to the community. No evidence was presented concerning the status of her IRA.

4. Likewise, Article 11, Section 5 of the Kwatamani Family Community By–Laws uses similar language in recognizing that the individual member will receive income as a member of the community and file an individual income tax return:

Each member of the corporation has a definite, though undivided, interest in the community treasury and property of the

Consequently, not only do Ms. Belcher and her dependent maintain a minimal standard of living, but Ms. Belcher, as a member of the community, will have her pro rata share of the income allocated to her as a dividend received. 26 U.S.C. § 61 (1984).

Ms. Belcher submitted no evidence as to the amount of income or the value of the possessions the Kwatamani Family Community receives or the pro rata amount of income attributed or to be attributed to her and her dependent. Consequently, the evidence is insufficient to provide any meaningful analysis of Ms. Belcher's present income and expenses.

The court recognizes that the Kwatamani Family Community's § 501(d) status is pending and may not be granted. No evidence was presented to establish present or future expectations of income in the event of failure to achieve that status. The By–Laws of the non-profit community provide each member with the "[r]ight to support, i.e. adequate food, shelter, and clothing":

> All members of the Kwatamani Family Community shall live in a communal manner as a unified divine social economic unit. Upon admission into the Kwatamani Family Community, a member shall enjoy all the rights and privileges of membership, including, but not limited to the provision of adequate food, shelter, and clothing for that member and any of his or her minor children who are accepted into the community. Any additional needs or expenses of members shall be evaluated on a case-by-case basis.

Article 11, Section 3. At the very least, as a result of such support and activities of the community, there will be income allocable to Ms. Belcher.[5]

The court finds the living circumstances of Ms. Belcher and her dependent to be readily distinguishable from those debtors who have been granted hardship discharges of student loans in the cases upon which she relies. Ms. Belcher has failed to meet her burden of proof and does not satisfy the first part of the *Brunner* test.

### (B) First Amendment Rights

■ Ms. Belcher argues that denial of discharge of her student loan debt due to undue hardship amounts to a violation of the free exercise clause of the First Amendment. She alleges she is being forced to choose between following her religious dictates or paying off her student loan debt by working for money at a job outside of the community. Plaintiff argues that such an interpretation of the Bankruptcy Code and case law is inconsistent and conflicts with her rights under the free exercise clause of the First Amendment. First, Ms. Belcher has failed to establish that her decision not to work outside the community has a religious basis. Ms. Belcher testified that two members of the community had worked outside of the community, one as recently as six months ago. Ms. Belcher did not present any evidence that the community's religious beliefs required its members not to work outside

corporation. The business of the corporation is conducted for the common benefit of all of the members. Each member of the organization must include in his or her gross income (at the time of filing his or her individual income tax return) his or her *pro rata* share, whether distributed or not, of the net income of the corporation for the taxable year of the corporation ending with

or during his or her taxable year. Any amount so included in the gross income of a member shall be treated as a dividend received.

**5.** The court will not speculate on what might happen if the Kwatamani Family Community is not granted § 501(d) status.

the community. *Frazee,* at 833, 109 S.Ct., at 1517 ("There is no doubt that '[o]nly beliefs rooted in religion are protected by the Free Exercise Clause', *Thomas, supra,* 450 U.S., at 713, 101 S.Ct., at 1430.") Therefore, her argument that she is being forced to choose between her religious convictions and repaying her loan is unsupported in this record and is unavailing.

■ Second, the court finds that Ms. Belcher's attempt to draw an analogy with the *Sherbert, Thomas, Hobbie,* and *Frazee, supra,* plaintiffs is erroneous. The United States Supreme Court has clearly determined that there is no constitutional right to a discharge of one's debts in bankruptcy. *United States v. Kras,* 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973); *In re Krohn,* 886 F.2d 123, 127 (6th Cir.1989); *In re Fitzgerald,* 167 B.R. 689, 691 (Bankr.N.D.Ga.1994); *United States v. Merritt,* 186 B.R. 924, 932 (Bankr.S.D.Ill.1995); *Transamerica Premier Insurance Co. v. Chaplin,* 179 B.R. 123, 128 (Bankr.E.D.Wis.1995). The adjustment of debt "is in the area of economics and social welfare." *Kras,* at 446, 93 S.Ct., at 638. The strict scrutiny test is not applicable to bankruptcy law.

> Bankruptcy is hardly akin to free speech or marriage or to those other rights, so many of which are imbedded in the First Amendment, that the Court has come to regard as fundamental and that demand the lofty requirement of a compelling governmental interest before they may be significantly regulated... Neither does it touch upon what have been said to be the suspect criteria of race, nationality, or alienage.

*Id.* (citations omitted).

■ Bankruptcy law is facially neutral and applies to all applicants for the benefits involved. *In re Lee,* 162 B.R. 31, 42 (Bankr.N.D.Ga.1993)(analysis of 11 U.S.C. § 707(b) in context of tithing). "Absent proof of an intent to discriminate against particular religious beliefs, or against religion in general, the Government meets its burden when it demonstrates that a challenged requirement for governmental benefits, neutral and uniform in its application, is a reasonable means of promoting a legitimate public interest." *Bowen v. Roy,* 476 U.S. 693, 707, 106 S.Ct. 2147,2156, 90 L.Ed.2d 735 (1986). As previously noted, Congress made a public policy choice to make student loans particularly difficult to discharge.

Ms. Belcher relies heavily on the *Sherbert v. Verner* decision, *supra,* which was decided in 1963. In a 1990 Supreme Court decision, *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, the Court made some important observations about its earlier decision: "We have never invalidated any governmental action on the basis of the Sherbert test except the denial of unemployment compensation. Although we have sometimes purported to apply the Sherbert test in contexts other than that, we have always found the test satisfied.... In recent years we have abstained from applying the Sherbert test (outside the unemployment compensation field) at all." *Id.,* at 883, 110 S.Ct., at 1602. Thus, Ms. Belcher's attempt to rely on *Sherbert, Thomas, Hobbie,* and *Frazee* is misplaced.

At trial, Ms. Belcher raised a further constitutional argument. She claimed her right to freedom of association and the freedom to direct the education and upbringing of her daughter would be violated if she were denied an undue hardship discharge. Defendants objected to the introduction of these arguments at this late stage. The court agrees that Plaintiff cannot wait until the day of trial to raise such arguments. *Marschand v. Norfolk and Western Railway Co.,* 81 F.3d 714, 716

(7th Cir.1996) ("factfinder need not consider any claim or theory not raised in the pretrial order"); *Morro v. City of Birmingham*, 117 F.3d 508 (11th Cir.1997).

Nevertheless, the court notes that Plaintiff's pre-existing liability for her student loan did not prohibit or impair her freedom of association in voluntarily joining this community group. Likewise, her continued student loan liability, due to denial of a bankruptcy undue hardship discharge, is neutral as to Ms. Belcher's and her daughter's freedom of association; it neither requires her to nor prohibits her from working outside the community. Her liability simply continues undischarged. Plaintiff has not presented evidence or authority to establish any constitutional violation.

In conclusion, the court finds and determines that Plaintiff has failed to carry her burden of proof to establish that she should be granted an undue hardship discharge. Accordingly, it is

ORDERED that Plaintiff's complaint to determine the dischargeability of her student loan debts on the grounds of undue hardship is denied, and her student loans are determined to be non-dischargeable.

The clerk is directed to serve a copy of this order upon Plaintiff and counsel for Defendants.

IT IS SO ORDERED.